JPL/NMA:AB/SR
F. #2023R00666

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -                                        No. 23-CR-437 (S-2) (AMD)

BRANDON NUDELMAN,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANT'S POST-TRIAL MOTIONS</u>

                                         JOSEPH NOCELLA, JR.
                                         UNITED STATES ATTORNEY
                                         Eastern District of New York
                                         271 Cadman Plaza East
                                         Brooklyn, New York 11201

Arun Bodapati
Trial Attorney
Samuel Rackear
Special Assistant U.S. Attorney
      (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

THE FACTS ESTABLISHED AT TRIAL ........................................................................... 2

ARGUMENT....................................................................................................................... 14

I.    The Weight of the Evidence Favored the Jury's Verdict on Every Count ...................... 14

II.   Defendant Had a Full and Fair Opportunity to Cross Examine Detective Molinaro, and
      There Is No Prejudice Warranting a New Trial ................................................................ 35

      A. Applicable Law .......................................................................................................... 36

      B. Discussion ................................................................................................................... 36

III.  The Government Did Not Constructively Amend the Indictment..................................... 43

      A. Applicable Law .......................................................................................................... 44

      B. Discussion ................................................................................................................... 45

IV.   There Was No Confrontation Clause Violation................................................................ 49

V.    The Admission of Government Exhibit 100BL Was Not Error and Does Not Warrant a
      New Trial .......................................................................................................................... 56

VI.   The Government Appropriately Argued Reasonable Inferences from the Evidence in
      Summation and Rebuttal................................................................................................... 63

      A. Applicable Law .......................................................................................................... 64

      B. Discussion ................................................................................................................... 65

CONCLUSION.................................................................................................................... 74

TABLE OF AUTHORITIES

Cases                                                                                                    Page(s)

Arroyo v. Lee,
   831 F. Supp. 2d 750 (S.D.N.Y. 2011)..................................................................................... 51

Brady v. Maryland,
   373 U.S. 83 (1963).......................................................................................................... 35

Crawford v. Washington,
   541 U.S. 36 (2004).......................................................................................................... 50

Darden v. Wainwright,
   477 U.S. 168 (1986)........................................................................................................ 64

Diaz v. Miller,
   No. 22-1835, 2023 WL 4363245 (2d Cir. July 6, 2023)............................................. 52, 56

Gonzalez v. Sullivan,
   934 F.2d 419 (2d Cir. 1991)........................................................................................... 65

Gutierrez v. McGinnis,
   389 F.3d 300 (2d Cir. 2004)........................................................................................... 62

Holland v. United States,
   348 U.S. 121 (1954)........................................................................................................ 17

Jackson v. Virginia,
   443 U.S. 307 (1979)........................................................................................................ 15

McBee v. Burge,
   395 F. App'x 762 (2d Cir. 2010) ............................................................................... 50, 62

McGuire v. Vill. of Hempstead,
   No. 20-CV-02117 (JMW), 2025 WL 2880086 (E.D.N.Y. Oct. 9, 2025) ............................. 60

Michigan v. Bryant,
   562 U.S. 344 (2011)................................................................................................... 50, 52

Mungo v. Duncan,
   277 F. Supp. 2d 176 (E.D.N.Y. 2003) ............................................................................. 52

Ohio v. Clark,
   576 U.S. 237 (2015)................................................................................................... 50, 52

Old Chief v. United States,
   519 U.S. 172 (1997)........................................................................................................ 46

Perkins v. Herbert,
   596 F.3d 161 ........................................................................................................... 55, 63

Quarshie v. Garland,
   No. 19-2519, 2022 WL 4454530 (2d Cir. Sept. 26, 2022) ......................................... 24, 25

Richardson v. Marsh,
   481 U.S. 200 (1987)................................................................................................... 51, 54

Ryan v. Miller,
   303 F.3d 231 (2d Cir. 2002)........................................................................................... 54

Turner v. United States,
   582 U.S. 313 (2017)........................................................................................................ 38

United States v. Aguiar,
   737 F.3d 251 (2d Cir. 2013)........................................................................................... 15

United States v. Ajmal,
　　67 F.3d 12 (2d Cir. 1995) ........................................................................ 24
United States v. Archer,
　　977 F.3d 181 (2d Cir. 2020).................................................... 18, 20, 27, 55
United States v. Atilla,
　　966 F.3d 118 (2d Cir. 2020)................................................................... 57
United States v. Bagaric,
　　706 F.2d 42 (2d Cir. 1983)..................................................................... 72
United States v. Banki,
　　685 F.3d 99 (2d Cir. 2011).................................................................... 64
United States v. Banki,
　　733 F. Supp. 2d (E.D.N.Y. Jul. 30, 2010)............................................. 65
United States v. Bastian,
　　770 F.3d 212 (2d Cir. 2014).................................................................. 45
United States v. Becker,
　　502 F.3d 122 (2d Cir. 2007).................................................................. 51
United States v. Best,
　　219 F.3d 192 (2d Cir. 2000).................................................................. 15
United States v. Bouterse,
　　765 F. App'x 463 (2d Cir. 2019) ........................................................... 58
United States v. Burden,
　　112 F. App'x 111 (2d Cir. 2004) ........................................................... 41
United States v. Cantoni,
　　No. 19-4358, 2021 WL 5829754 (2d Cir. Dec. 9, 2021)......................... 41
United States v. Ceballos,
　　340 F.3d 115 (2d Cir. 2003).................................................................. 15
United States v. Coplan,
　　703 F.3d 46 .................................................................................... 43, 64
United States v. Coppa,
　　267 F.3d 132 (2d Cir. 2001).................................................................. 39
United States v. Cummings,
　　858 F.3d 763 .......................................................................................... 62
United States v. Daly,
　　125 F.3d 845 (2d Cir. 1997).................................................................. 37
United States v. D'Amelio,
　　683 F.3d 412 (2d Cir. 2012)............................................................. 44, 45
United States v. Desena,
　　260 F.3d 150 (2d Cir. 2001).................................................................. 59
United States v. Desena,
　　287 F.3d 170 (2d Cir. 2002).................................................................. 16
United States v. Dove,
　　884 F.3d. 138 (2d Cir. 2018)................................................................. 44
United States v. Downing,
　　297 F.3d 52 (2d Cir. 2002).................................................................... 51
United States v. Dupree,
　　706 F. 3d 131 (2d Cir. 2013).............................................................. 57, 58

United States v. Elias,
    285 F.3d 183 (2d Cir. 2002)................................................................................. 65, 73
United States v. Espinal,
    981 F.2d 664 (2d Cir.1992)...................................................................................... 65
United States v. Estevez,
    735 F. App'x 746 (2d Cir. 2018) ......................................................................... 24, 25
United States v. Farhane,
    634 F.3d 127 (2d Cir. 2011)..................................................................................... 74
United States v. Ferguson,
    246 F.3d 129 (2d Cir. 2001)................................................................................ 18, 21
United States v. Florez,
    447 F.3d 145 (2d Cir. 2006)..................................................................................... 15
United States v. Gaggi,
    811 F.2d 47 (2d Cir. 1987)....................................................................................... 40
United States v. Gagliardi,
    506 F.3d 140 (2d Cir. 2007)..................................................................................... 16
United States v. Gambino,
    59 F.3d 353 (2d Cir. 1995)....................................................................................... 17
United States v. Garcia,
    413 F.3d 201 (2d Cir. 2005)......................................................................... 58, 61, 63
United States v. Gigante,
    166 F.3d 75 (2d Cir. 1999)....................................................................................... 58
United States v. Glenn,
    312 F.3d 58 (2d Cir. 2002)....................................................................................... 16
United States v. Gonzalez,
    110 F.3d 936 (2d Cir. 1997)..................................................................................... 46
United States v. Gross,
    No. 15-CR-769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) ..................... 44
United States v. Guadagna,
    183 F.3d 122 (2d Cir. 1999)................................................................................ 15, 16
United States v. Guerra,
    334 F.2d 138 (2d Cir. 1964)..................................................................................... 41
United States v. Heimann,
    705 F.2d 662 (2d Cir. 1983)..................................................................................... 44
United States v. Huezo,
    546 F.3d 174 (2d Cir. 2008)..................................................................................... 16
United States v. Hunter,
    32 F. 4th 22 (2d Cir. 2022) ................................................................................. 36, 38
United States v. Irving,
    452 F.3d 110 (2d Cir. 2006)..................................................................................... 16
United States v. Jackson,
    335 F.3d 170 (2d Cir. 2003)..................................................................................... 16
United States v. James,
    712 F.3d 79 (2d Cir. 2013)................................................................................. passim
United States v. Jass,
    569 F.3d 47 (2d Cir. 2009)................................................................................. 51, 53

United States v. Jaswal,
  47 F.3d 539 (2d Cir. 1995)..................................................................................... 72
United States v. Jespersen,
  65 F.3d 993 (2d Cir. 1995)..................................................................................... 16
United States v. Jimenez,
  96 F.4th 317 (2d Cir. 2024) ................................................................................... 34
United States v. Katz,
  601 F.2d 66 (2d Cir. 1979)..................................................................................... 60
United States v. Khan,
  787 F.2d 28 (2d Cir. 1986)..................................................................................... 16
United States v. Landesman,
  17 F.4th 298 (2d Cir. 2021) ............................................................................. passim
United States v. Litvak,
  889 F.3d 56 (2d Cir. 2018)..................................................................................... 57
United States v. Locascio,
  6 F.3d 924 (2d Cir. 1993) ...................................................................................... 18
United States v. Lorenzo,
  534 F.3d 153 (2d Cir. 2008)................................................................................... 16
United States v. Maldonado-Rivera,
  922 F.2d 934 (2d Cir. 1990)................................................................................... 59
United States v. Malka,
  602 F. Supp. 3d 510 (S.D.N.Y. 2022).................................................................... 58
United States v. Mariani,
  725 F.2d 862 (2d Cir. 1984)............................................................................. 17, 30
United States v. McCallum,
  584 F.3d 471 (2d Cir. 2009)................................................................................... 55
United States v. McClain,
  377 F.3d 219 (2d Cir. 2004)............................................................................. 50, 55
United States v. McCourty,
  562 F.3d 458 (2d Cir. 2009)......................................................................... 17, 18, 21
United States v. Mejia-Ramos,
  798 F. App'x 749 (4th Cir. 2019) ..................................................................... 24, 25
United States v. Moseley,
  980 F.3d 9 (2d Cir. 2020) ...................................................................................... 59
United States v. Mulder,
  273 F.3d 91 (2d Cir. 2001)..................................................................................... 34
United States v. Mussaleen,
  35 F.3d 692 (2d Cir. 1994)..................................................................................... 61
United States v. Nicolapolous,
  30 F.3d 381 (2d Cir. 1994)..................................................................................... 38
United States v. Patino,
  962 F.2d 263 (2d Cir. 1992)................................................................................... 45
United States v. Payton,
  159 F.3d 49 (2d Cir. 1998)..................................................................................... 15
United States v. Percevault,
  490 F.2d 126 (2d Cir. 1974)................................................................................... 37

United States v. Pope,
  574 F.2d 320 (2d Cir. 1978)......................................................................... 41, 42
United States v. Rahim,
  339 F. App'x 19 (2d Cir. 2009) ........................................................................ 43
United States v. Rea,
  958 F.2d 1206 (2d Cir. 1992)............................................................... 16, 57, 61
United States v. Reifler,
  446 F.3d 65 (2d Cir. 2006)......................................................................... 15, 16
United States v. Reyes,
  18 F.3d 65 (2d Cir. 1994) ................................................................................ 43
United States v. Reynosa,
  No. 22-1321, 2022 WL 17485956 (3d Cir. Dec. 7, 2022)................................ 26
United States v. Rivera,
  971 F.2d 876 (2d Cir. 1992)............................................................................ 72
United States v. Rodriguez,
  587 F.3d 573 (2d Cir. 2009)............................................................................ 73
United States v. Roldan-Zapata,
  916 F.2d 795 (2d Cir. 1990)............................................................................ 67
United States v. Rosa,
  17 F.3d 1531 (2d Cir. 1994)............................................................................ 74
United States v. Rosenthal,
  9 F.3d 1016 (2d Cir. 1993).............................................................................. 17
United States v. Salameh,
  125 F.3d 88 (2d Cir. 1998).............................................................................. 25
United States v. Salmonese,
  352 F.3d 608 (2d Cir. 2003)....................................................................... 45, 46
United States v. Sanchez,
  969 F.2d 1409 (2d Cir. 1992)...................................................................... 18, 19
United States v. Sasso,
  59 F.3d 341 (2d Cir. 1995).............................................................................. 18
United States v. Scotti,
  47 F.3d 1237 (2d Cir. 1995)............................................................................ 37
United States v. Sessa,
  711 F.3d 316 (2d Cir. 2013)....................................................................... 38, 40
United States v. Shareef,
  190 F.3d 71 (2d Cir. 1999).............................................................................. 64
United States v. Snype,
  441 F.3d 119 (2d Cir. 2006)............................................................................ 53
United States v. Stitsky,
  536 F. App'x 98 (2d Cir. 2013) ....................................................................... 46
United States v. Temple,
  447 F.3d 130 (2d Cir. 2006)............................................................................ 15
United States v. Templeman,
  965 F.2d 617 (8th Cir. 1992) .......................................................................... 26
United States v. Thomas,
  377 F.3d 232 (2d Cir. 2004)............................................................................ 65

United States v. Tillem,
  906 F.2d 814 (2d Cir. 1990)...................................................................................... 17
United States v. Tocco,
  135 F.3d 116 (2d Cir. 1998)............................................................................... 52, 64
United States v. Torres,
  124 F.4th 84 (2d Cir. 2024) ...................................................................................... 26
United States v. Torres,
  435 F. Supp. 3d 526 (S.D.N.Y. 2020)...................................................................... 60
United States v. Van Manen,
  No. 18-CR-030 (PAC), 2019 WL 5092013 (S.D.N.Y. Oct. 11, 2019)..................... 18
United States v. Vilar,
  729 F.3d 62 (2d Cir. 2013)................................................................................. 44, 49
United States v. Walker,
  835 F.2d 983 (2d Cir. 1987)...................................................................................... 65
United States v. Watson,
  No. 23-CR-82 (EK), 2024 WL 4455773 (E.D.N.Y. May 31, 2024) ......................... 58
United States v. Wexler,
  522 F.3d 194 (2d Cir. 2008)...................................................................................... 17
United States v. Young,
  470 U.S. 1 (1985)...................................................................................................... 65
White v. Illinois,
  502 U.S. 346 (1992).................................................................................................. 52
Yusuf v. Colvin,
  No. 18-CV-3360 (MKB), 2022 WL 4291784 (E.D.N.Y. Sept. 16, 2022)................. 53
Zafiro v. United States,
  506 U.S. 534 (1993)............................................................................................ 43, 51
Zervos v. Verizon N.Y., Inc.,
  252 F.3d 163 (2d Cir. 2001)...................................................................................... 57

Statutes

18 U.S.C. § 3500........................................................................................................... 36

Rules

Fed. R. Crim. P. 29 ................................................................................................ passim
Fed. R. Crim. P. 33 ................................................................................................ passim
Fed. R. Evid. 801(d)(2)(E)............................................................................................ 58
Fed. R. Evid. 803(2)...................................................................................................... 52

PRELIMINARY STATEMENT

After a weeklong trial, a jury convicted Defendant on every count charged against him:  conspiracy to traffic firearms, firearms trafficking, and conspiracy to obstruct justice.  That verdict was proper in every respect.  Despite the extensive evidence supporting each conviction, Defendant now moves under Federal Rules of Criminal Procedure 29 and 33 to set aside the verdict and redo trial altogether.  See "Mot.," ECF No. 136.  He claims the evidence was insufficient to convict and even preponderates heavily against the verdict, alleging that he only "lent Justin [Nudelman] money, paid his credit card bills, and ordered him food in the hospital."  Id. at 1.

That dismissive framing says nothing about the fact that Defendant (1) was caught on video shooting an illegal machinegun conversion device ("MCD") with Justin Nudelman and coconspirator Michael Daddea; (2) actively texted Justin that he had found a buyer for another illegal gun; and (3) regularly brought prospective buyers to a home where law enforcement officers later recovered 35 illegally manufactured ghost guns — to provide just three examples from a trial record containing over 150 exhibits and a week's worth of testimony.  Defendant's arguments about the obstruction conviction are similarly deficient.  To provide just one example, he never squarely addresses the substantially uncontested evidence that he tried to leave the hospital with Justin's phone hidden in his pocket, without ever telling the officers who had served Justin with a warrant for the phone right in front of him.  Defendant's arguments do not seriously engage with the full trial record, and they certainly do not warrant an acquittal.

Perhaps recognizing that the weight of the evidence favored the verdict, Defendant offers a grab bag of five other arguments in support of a new trial.  These arguments also fall far short of the high bar that he must clear under Rule 33.  In one section, he claims he is entitled to a new trial based on a single text about a vape left on Justin Nudelman's hospital bed.  In another

1

section, he claims he deserves a new trial because of a four-word phrase that was immediately stricken from the record and never mentioned again. And while that section depends on the idea that the jury convicted based on evidence that he broke Justin's phone, in another section Defendant contradicts himself by arguing that the obstruction conviction was premised solely on his lies to officers earlier in the day. His remaining arguments fare no better, as detailed below.

Ultimately, Defendant asks this Court to ignore much of the evidence, draw every inference in his favor, disagree with the jury's assessments of credibility, and find that he was just unintentionally furthering a conspiracy to 3D-print machineguns. That does not come close to meeting the demanding standards of Rules 29 and 33. The jury's verdict was not a "manifest injustice," and there is no "real concern that an innocent person may have been convicted." United States v. James, 712 F.3d 79, 107 (2d Cir. 2013) (internal quotation marks omitted). Defendant is guilty, and his motions should be denied.

THE FACTS ESTABLISHED AT TRIAL

The jury's verdict was firmly rooted in the trial record and the reasonable inferences that the jury was entitled to draw. As set forth below, overwhelming evidence established that Defendant was guilty beyond a reasonable doubt of conspiring to traffic firearms, trafficking firearms, and conspiring to obstruct justice.

I.      Defendant's Knowing and Willful Participation in the Firearms Trafficking Scheme

Defendant, Justin Nudelman, Ronnie Mershon and Michael Daddea trafficked firearms for nearly two years, manufacturing well over 20 privately made firearms and dealing at least ten in illegal cash sales. Trial Tr. 34–36, 50, 58, 168. Initially, the conspirators assembled firearms using "Polymer80" kits that had most of the components needed to make operational firearms. Id. 42. After states banned the Polymer80 kits, the conspirators began to 3D print guns

2

instead.  Id. 42–43.  They did so by purchasing firearm parts from online sellers such as eBay and then using 3D printers to build the parts that they could not purchase online, such as the frames of handguns and the receivers of AR-style rifles.  Id. 84–85.

The firearms that Defendant and his coconspirators manufactured were not merely handguns or rifles, either.  As the evidence at trial established, the conspirators engaged in the unauthorized manufacture of no less than 25 MCDs — machineguns that are illegal to possess without government authorization.  Id. 37, 129, 652–53.  To avoid being caught with a significant volume of illegal guns, the conspirators stored the bulk of the firearms at a mobile home owned by Philip Allegretti in Pennsylvania.  See id. 138–142; GX 704 (video depicting the firearms in the mobile home); GX 707 (showing 13 of the guns, including one with an MCD attached to the back, in the mobile home); GX 707A (highlighting the MCD in GX 707).  The conspirators also test fired the illegally manufactured guns and MCDs in Pennsylvania to ensure that their products functioned as intended and advertised.  Trial Tr. 137, 147.

Defendant and his coconspirators made these unlicensed "ghost guns" available for sale to willing buyers, sharing firearms, materials and money as needed to facilitate sales.  Id. 36–37, 45, 58.  The sales primarily took place on Staten Island, including at Justin Nudelman's home, where Defendant would frequently bring prospective customers to view the illegal firearms, as well as in Pennsylvania.  Id. 45–47, 162–164.  The conspirators took payment in cash to decrease the traceability of their illegal sales, typically selling the guns for anywhere from $700 to $1000.  Id. 60–61.  They charged these prices, which were often double or triple the prices at licensed gun stores, recognizing that their customer base consisted of people who either could not or would not purchase guns from legal retailers.  Id. 60–61, 306.

3

The scheme came to an end on the morning of September 7, 2023, when law enforcement officers executed a judicially-authorized search warrant on Justin Nudelman's home. Id. 316. During the search, officers seized a range of firearms and related evidence, including four 3D printers, an "extender" that would allow 3D printers to print multiple guns at once, numerous rounds of ammunition, and four "receiver blanks" that needed minimal drilling to become functional rifles. Id. 127–128, 316, 330, 340–342, 344–345, 349–350, 434, 609–611. Firearms Enforcement Officer Nino DeMarco later testified at trial that the seized items included 35 firearms, 25 of which were illegal MCDs. See id. 604–605, 651–653, 670 (opining that 20 items examined were firearms, with one item being a bag of 16 MCD "legs"). Seven of these MCDs were so-called "switches" that could be used to turn Glock-style handguns into machineguns, while two others were 3D-printed "auto sears" that could be used to convert AR-style rifles into machineguns. See id. 639, 653, 667; GX 1700 at 49–93.

Defendant played an integral role in this conspiracy, participating in substantially every step needed to ensure its success. The evidence at trial established Defendant's (1) advice, encouragement, and agreement to illegally traffic firearms; (2) his material support and financing of the manufacturing; and (3) his advertisement and sale of the firearms to trusted associates.

A.    The Defendant's Advice, Encouragement, and Agreement to Illegally Manufacture and Deal Firearms

Defendant played a significant part in shaping the contours of the illegal conspiracy, meeting with his coconspirators to decide (1) what firearms and firearm parts to make, (2) how to sell them, (3) the prices at which to sell them, and (4) who to sell them to. Defendant's knowing and willful agreement to traffic firearms was a natural outgrowth of his own experience with firearms, an experience that his coconspirators shared. Defendant, Justin Nudelman, and Ronnie Mershon were all convicted felons, unable to legally buy firearms from licensed sellers. See GX

4

1405R; Trial Tr. 37, 42.  Motivated by their own inability to purchase firearms legally, Defendant and his coconspirators saw an opportunity to make money by selling unregulated firearms to individuals who either could not or would not purchase guns from legal sellers.  Trial Tr. 60–61, 306.  The conspirators manufactured these firearms primarily for sale, rather than as a hobby or for personal enjoyment.  Id. 36–37, 45, 58.  And Defendant and his coconspirators willfully engaged in this business without a license to do so.  See GX 1400–1403; Trial Tr. 34–36.

During the conspiracy, Defendant met with coconspirators Justin Nudelman and Ronnie Mershon at Justin's home on a weekly basis to discuss the scope of the illegal scheme.  Trial Tr. 34–35, 47, 93–94, 304.  Among other contributions, Defendant specifically encouraged the manufacture of small, easily concealable handguns like the Glock 43.  See, e.g. id. 47, 337–338 (noting that Justin's home had an empty bag of "concealed carry gun clips" for Glock 43-style models).  Defendant's idea was evidently inspired by his own experience as a convicted felon who could not be caught with firearms, and he possessed a privately-made Glock 43-style pistol himself.  See id. 61–63, 69–70, 301; GX 300B (Justin asking Mershon "should I order [a gun part] for that [Glock 43] . . . my bro [Defendant] will take it from me").  Defendant even prepared secret compartments that could be used to conceal handguns if needed.  In one example from coconspirator Michael Daddea's Instagram account, Defendant is seen meeting Daddea in a Lamborghini where he had previously shown Mershon a secret compartment with a Polymer80 Glock 43 inside.  Trial Tr. 71–74; GX 909 (video from Daddea's Instagram account); GX 909B (noting where the secret compartment was).

Defendant also gave input on how to price the illegal firearms.  At trial, Mershon testified to an example where Defendant encouraged selling firearms at Mershon's favored price point of $700 rather than Justin Nudelman's more ambitious $1000 price point.  Trial Tr. 48.

Defendant's support of that $700 figure is noteworthy, as it is still more than twice the price that established dealers charge for firearms.  Id. 60–61, 306.  And to encourage sales to buyers who might balk at those high figures, Defendant inspired his coconspirators to sell firearm frames at a discount or in package deals, so that buyers could purchase any remaining components and finish making the guns themselves.  See id. 47–49, 93–94.  Because federal law classifies frames as firearms, convicted felons could not legally buy frames either.  Id. 95.  Videos from Justin's phone reveal him gathering and bagging 3D-printed frames for sale, effectively demonstrating how he put Defendant's advice into practice.  See GX 712; Trial Tr. 505.

B.      The Defendant Financed the Manufacturing of Illegal Firearms

Defendant did not just give his coconspirators ideas, either.  He gave them the money and materials they needed to manufacture firearms.  Defendant's support for the gun trafficking scheme was a natural outgrowth of a parallel drug trafficking scheme that he engaged in with Justin Nudelman.  The two sold drugs like marijuana and cocaine together before and during the course of the gun trafficking scheme.  See, e.g., Trial Tr. 74–77, 81–83, 304.  As with the gun sales, they arranged these drug sales at Justin's home, sometimes with Mershon.  Id. 77–79.  Defendant gave Justin thousands of dollars as needed to source large quantities of drugs for resale.  As Mershon noted, these included instances where Defendant provided Justin with money to buy $10,000 worth of marijuana from one dealer, as well as large amounts of marijuana concentrate that Justin advertised for sale on another occasion.  Id. 74–77, 81–83, 304.  Defendant and Justin also sourced cocaine from California, receiving the cocaine by mail.  Id. 74–77, 81–83, 304.  Text messages from Justin's phone reveal additional conversations in which the Nudelman brothers discussed their drug dealing.  See, e.g., GX 100F (Defendant texting Justin that an associate "wants to grab bud [i.e. marijuana] from you, send me what you got I'll try and get these

6

other [people] to make an order with him," followed by Justin sending a picture of a large volume of marijuana products); GX 100G (Justin informing Defendant that the "cokes went to Florida already"); Trial Tr. 570–571 (Justin asking Defendant if he would "run two zips" of drugs to a customer so that he wouldn't "lose sales").

Against this backdrop of shared drug trafficking activity, gun trafficking was simply another shared line of business for Defendant and Justin Nudelman. Because Justin lacked a job, Defendant gave Justin the money and materials that he needed to manufacture guns, in much the same way that he lent Justin money to source drugs. Trial Tr. 36–37, 43, 74–75, 204. Justin dutifully kept Defendant apprised of how he used Defendant's financial support to further the illegal scheme, sending Defendant links to the gun parts that he would purchase using the funding that Defendant provided. Id. 85–87; GX 100H (sending Defendant link to a Glock conversion kit); GX 100K (sending links to Glock slides); Trial Tr. 506–507; see also, e.g., GX 1102 (eBay purchases of firearm parts by Justin Nudelman); Trial Tr. 512–513 (noting GX 1102 reflected over 50 firearm-related purchases by just one of Justin Nudelman's many eBay accounts alone).

Justin Nudelman likewise sent Defendant pictures showing the 3D printers that he bought with Defendant's financial support, including an "extender" that would allow the printers to make more guns at one time. See Trial Tr. 98, 448–459, 484–487; GX 100AS. In one notable example, Defendant helped Justin purchase a third Creality Ender, a readily affordable printer that Justin and Mershon had already shown him they were using to manufacture firearms. See Trial Tr. 74, 92–93, 95–97, 130, 188–189, 309–311. On the evening of August 15, 2023, Justin sent Defendant a series of photographs and videos showing him assembling firearm parts and a 3D-printed frame to manufacture a compact, concealable handgun called a Diamondback 380, followed by pictures showing guns being sold. See id. 91–92, 488–489; GX 100AZ at 1–3; GX

7

100AZ-001 and 002 (showing trigger, slide, and barrel); GX 100AZ-003–005 (showing the parts with a 3D-printed frame on Justin's pool table); GX 100AZ-006 (showing gun listed as "SOLD" on auction site Bryant Ridge).

The very next morning, Defendant helped Justin Nudelman purchase a third Creality Ender by sending Justin text messages with his email address and other information needed to purchase the printer at a discount, and then sending Justin the receipt for the printer after the fact. GX 100AZ at 4–6; GX 100BA at 1; GX 1100 at 1 (Micro Center records showing Defendant's name and the discount coupon used); Trial Tr. 490–493 (noting the 3D printer was later recovered from 28 Corona Avenue); GX 300AB (Justin telling Mershon "Donnie [i.e. Defendant] sent me the micro center [receipt]."). Justin apprised Ronnie of Defendant's role in buying the 3D printer, and the two assembled that printer just two days later. See Trial Tr. 98–104; GX 300Z at 10 (Justin informing Mershon that "mr brandon got it," i.e. that Defendant received a code to buy the 3D printer for only $99); GX 1001A.

Defendant also facilitated the transfer of money for firearm and narcotics sales between his coconspirators, in part because Justin Nudelman's lack of legitimate income limited his ability to open bank accounts or credit cards and in part because Justin conducted his illegal gun and drug sales in cash to limit the traceability of the transactions. Trial Tr. 60–61. For example, Defendant transferred money with all three of his codefendants through an account called "Nudelman Inc" to support their illegal activities. See GX 1200H-001 (Zelle records showing transactions between Nudelman Inc. and both Nudelman brothers, Mershon, and Michael Daddea (using the pseudonym "James P Holler")); Trial Tr. 571–576 (summarizing relevant transfers in GX 1200H-001); see also, e.g., GX 400A at 1–3, 6 (Daddea sending money to Defendant); GX

8

400E (Justin informing Daddea that Defendant would help pay for one of Daddea's guns when Defendant arrived at Justin's home).

Defendant lent this money with the expectation that Justin Nudelman would pay him back with the proceeds of his illegal sales. Defendant and Justin often texted each other the amount of money they owed each other and would get into heated arguments about how Justin needed to repay Defendant the money that he used to source guns and narcotics. Trial Tr. 83–84, 307, 546–552 (ATF Special Agent Ross Dinger noting financial transfers between Defendant and Michael Daddea), 554–555 (Dinger summarizing exhibit where Justin and Defendant arrange for an associate to send Defendant money), 560 (summarizing another exchange in which Justin acknowledges owing money to Defendant), 565–566 (another exchange in which Justin acknowledged owing money to Defendant for a "bag"), 570 (describing a conversation between Defendant and Justin regarding amounts owed); see also, e.g., GX 100A (Defendant transferring money and confirming how much Justin owed him).

While Defendant did not personally manufacture the firearms himself, he regularly saw Justin Nudelman and Mershon do so during their weekly meetings, and Justin regularly sent him a steady stream of images and videos showing Defendant the firearms that the conspirators were manufacturing with Defendant's support. See, e.g., GX 100X and attachments (showing a blue handgun and a fully assembled submachinegun); GX 100Z and attachments (showing a partially assembled submachine gun); GX 100AC (sending Defendant a picture of three 3D-printed handguns); GX 100AY and attachments (showing a Diamondback 380); GX 100AR (showing Defendant the stash of guns stored at Philip Allegretti's property in Pennsylvania).

Defendant also personally tested out the ghost guns, firing guns with Justin Nudelman, Michael Daddea, and others in Pennsylvania to demonstrate the guns' operability. In

9

one telling example, Defendant fired a Polymer80 handgun equipped with an MCD, which Justin and Mershon had assembled, together with Justin and Daddea. See GX 706; GX 706A (showing the gun firing multiple rounds automatically); GX 706B (highlighting the MCD for ease of identification); GX 1700 at 76 (noting the firearm appeared to be a Polymer80 with an MCD); GX 400C (Justin informing Daddea that he and Defendant would bring guns to him two days before the video in GX 706 was taken); Trial Tr. 149–151, 312, 660–661. In another example from the same day, an unidentified associate fired the same gun with an extended magazine attached, to more clearly demonstrate that the Polymer80 handgun had been turned into a machinegun. See GX 703. Videos from Justin's phone also show Defendant testing a privately made assault rifle at the same location. See GX 705. Mershon testified that the assault rifle that Defendant fired was privately made, as revealed by the fact that it had a "finished," or painted, barrel but an "unfinished," or metal, receiver. Trial Tr. 151, 156–157; GX 705A (highlighting the difference in color between the barrel and body of the assault rifle).

C.  Defendant Advertised and Arranged Illegal Firearm Sales

Defendant did not just aid the manufacturing of firearms, either. He marketed the guns for sale. Trial Tr. 157, 162–173. Defendant regularly brought friends, coworkers, and other associates as potential purchasers to Justin Nudelman's home, where the illegal firearms were manufactured. Id. 43, 47–48, 162–163, 303–304. Once Defendant confirmed those individuals could be trusted, Justin and Mershon would display the firearms, and together with Defendant they would describe the firearms and name their price. Id. 163, 304–305.

Defendant also helped arrange completed sales of firearms. Id. 45–46, 49. In particular, Mershon testified at trial that Defendant facilitated the sale of a firearm made by Justin Nudelman to a close friend of Defendant's named Bobby, who would often fight with Justin and

10

threaten Justin if he did not pay him back for money that Justin borrowed to purchase drugs and firearm parts. Id. 162, 164–167. As Mershon testified, he and Justin discussed selling either a privately made Glock 43 or Glock 26 to Bobby, with Bobby eventually buying the Glock 43 after Defendant persuaded him to do so. See Id. 167–168; GX 300S at 5. Evidence from Justin's phone likewise reflected Defendant's role in selling the guns. On June 10, 2023, Justin Nudelman sent Defendant a picture of three 3D-printed firearms. Less than a minute later, Defendant responded, "He said he[']ll call me wants to buy one [I'll] let you know thank you." See GX 100AC. None of these three guns were recovered from Justin's residence when law enforcement officers searched it three months later. Trial Tr. 563.

Shortly after Justin Nudelman's arrest, Defendant and Ronnie Mershon worked together to dispose of concealed evidence that officers did not find during the search of Justin's home on September 7, 2023. Defendant contacted Mershon to help clean out the home within a day or two of the arrest. Id. 179. When they reached the home, Defendant hurriedly opened secret compartments in Justin's furniture, revealing marijuana, cocaine, and a firearm. Id. 179–180. Mershon noted that the firearm was a distinctive .25 caliber Beretta with a chipped pearl handle, which Justin had taken videos of along with his other firearms. See Id. 180–181; GX 707B (showing the Beretta); GX 707C (showing the chip just below the bottom screw on the Beretta's handle); see also Trial Tr. 339–340 (Detective Molinaro noting that Beretta parts (but not the Beretta itself) had been recovered from Justin Nudelman's home). After uncovering the drugs and gun, Defendant told Mershon that he planned to sell them. Id. 181–82.

II.    The Defendant Conspired with Justin Nudelman to Obstruct Justice

While law enforcement officers had a warrant to arrest Justin Nudelman and seize his phone on the morning of September 7, 2023, they did not find him during their search of the

11

home.  Id. 317.  Accordingly, at roughly 5:00 AM that morning, officers went to Defendant's nearby home to ask where Justin was.  Id. 317, 362.  Defendant repeatedly lied to the officers by telling them that Justin was at Staten Island University North Hospital ("SIU North") on Seaview Avenue, when Justin had actually been receiving treatment at Richmond University Medical Center ("RUMC") for nearly two weeks by that time.  Id. 362.  Defendant repeatedly maintained that Justin was at SIU North, including in response to a direct question from Detective Paul Molinaro asking if Justin was at Richmond North (i.e. RUMC), which was actually the case.  Id. 364–65; GX 1500A.  Defendant also lied that he "barely talk[ed]" to Justin, though text messages from Justin's phone revealed that they were in regular contact.  See id.

Despite Defendant's repeated lies that Justin Nudelman was at SIU North, his text messages reveal that he knew Justin had been at RUMC since approximately August 27, 2023.  On that date, Justin messaged Defendant with his address and exact hospital room at RUMC.  See GX 100BE at 1 (informing Defendant that he was at "Rumc 6a room 26b"); Trial Tr. 581.  On multiple occasions in the days before Defendant lied to the officers about Justin's whereabouts, he sent food to Justin at the same RUMC address, most notably texting that precise hospital room to a food delivery driver.  See GX 100BE-001; Trial Tr. 581–583.  Text messages also suggested Defendant had visited Justin at RUMC on at least one occasion prior to September 7, 2023.  See GX 100BL (Justin asking Defendant on September 1, 2023 "[why] did you leave that vape on the front of my bed they took it and [were] like you're not supposed to have this"); Trial Tr. 583–584.

After the officers left for SIU North following their initial visit to Defendant's residence, Justin Nudelman and Defendant initiated a roughly two-hour call.  See GX 1301H at Row 17866 (showing a call of 7,278 seconds beginning at 9:21:43 UTC, or 5:21:43 ET, between the defendant and Justin); Trial Tr. 584–586.  Approximately ten minutes after starting the call

12

with Defendant, Justin began to delete conversations with his coconspirators.  At 5:32:02 AM that morning, Justin texted Ronnie Mershon the message "they came for me waterfall."  GX 300AG.  Mershon testified that he believed Justin was notifying him that law enforcement had come to arrest Justin for their illegal scheme.  Trial Tr. 179.  Justin deleted the chat with Mershon just seven seconds later, at 5:32:09 AM.  See GX 300AG.  Justin proceeded to delete his messaging conversations with Daddea, Allegretti, and Defendant while on the phone with Defendant.  See, e.g., GX 400O (message with Daddea showing a blue gun that Justin 3D printed); GX 500M (Justin sending a picture of the same gun to Allegretti); GX 100X (Justin sending a picture of the same gun to Defendant); Trial Tr. 520, 586–589.

When officers failed to find Justin Nudelman at SIU North, they returned to Defendant's residence just after 7:00 AM and found Defendant on the phone with Justin.  Trial Tr. 366–67.  Despite being informed that the officers could not find Justin at SIU North, Defendant yet again falsely insisted that Justin was at SIU North.  Trial Tr. 366–68, 371; GX 1501A.

When the officers eventually learned from Justin Nudelman's aunt that he was at RUMC, rather than SIU North, Defendant went to RUMC as well.  Trial Tr. 372, 388, 758–759.  At the hospital, the officers arrested Justin and asked him to provide his cell phone pursuant to a search warrant; Justin refused, stating that he did not have a phone.  Trial Tr. 372–373, 760; GX 1501B.  The officers handcuffed Justin's free hand, as his other arm was in a cast and he was bedridden due to a leg injury.  See GX 1501B.  Justin began to scream and cause a commotion, so hospital staff requested that the officers wait in the hallway.  Trial Tr. 373–374.  Marek Mazur, the Head of Security at RUMC, remained in the hospital room.  After the officers left the room, Mazur observed Defendant whisper to Justin to give him Justin's phone, with Justin complying.  Trial Tr. 373–374, 761, 763.  Mazur then saw Defendant hide that phone by putting it in his own

13

pocket rather than providing it to the officers. Trial Tr. 761, 764–766. Almost simultaneously with the exchange of the phone, Mazur heard a crack like the breaking of plexiglass. Trial Tr. 765.

Although Defendant had been whispering to Justin Nudelman while asking him to give the phone, once Defendant received the phone he raised his voice, loudly claimed he was "done with" Justin, and tried to leave the hospital about thirty seconds after getting the phone. Id. 766. While Defendant told the officers that he was "done with" Justin and was leaving, he did not tell the officers that he had Justin's phone in his pocket. Id. 767. Mazur then alerted the officers about Defendant's actions, as he inferred that Defendant was trying to leave the hospital with the phone that the officers had a warrant to seize. Id. 764, 767–68. An officer then confronted Defendant and asked him where the phone was, prompting Defendant to remark, "oh, [the] security [guard] told you that?" Id. 767. Defendant then handed over the phone, which the officers later confirmed was Justin's. Id. 378–79. When the officers received the phone, it was significantly damaged, with a cracked glass screen and warping in the top corner. Id. 378–80, 743; GX 700.

ARGUMENT

I.      The Weight of the Evidence Favored the Jury's Verdict on Every Count

Defendant moves for a judgment of acquittal under Rule 29, claiming that the overwhelming evidence of guilt summarized above was insufficient to convict him. He similarly moves for a new trial under Rule 33 by claiming the evidence heavily preponderated against the jury's verdict. Defendant's arguments are divorced from the record and the demanding bars for relief under either Rule. Far from carrying his heavy burden, Defendant asks this Court to defy controlling law by (1) ignoring much of the evidence; (2) drawing all inferences in his favor, rather than the jury's; (3) setting aside the jury's credibility assessments and throwing testimony out; and (4) analyzing evidence piecemeal, disregarding the overall record in favor of tangents that bear

14

little on guilt or innocence.  That does not warrant disregarding the jury's verdict and redoing a lengthy trial, let alone acquitting Defendant.  He is guilty, and the motions should be denied.

A.       Applicable Law

1.       The Rule 29 Standard

A defendant "challenging the sufficiency of the evidence to support his conviction 'bears a heavy burden.'" United States v. Ceballos, 340 F.3d 115, 124 (2d Cir. 2003) (quoting United States v. Best, 219 F.3d 192, 200 (2d Cir. 2000)). To prevail under Rule 29, a defendant must show that no rational trier of fact could find the elements of each crime beyond a reasonable doubt.  United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013); see Jackson v. Virginia, 443 U.S. 307, 319 (1979) (noting standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"); United States v. Payton, 159 F.3d 49, 56 (2d Cir. 1998) (explaining "ultimate question is not whether we believe the evidence adduced at trial established [the] defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find").  In other words, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Temple, 447 F.3d 130, 136 (2d Cir. 2006) (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)).

Reviewing courts must "view the evidence in its totality and in the light most favorable to the prosecution."  United States v. Florez, 447 F.3d 145, 154–55 (2d Cir. 2006). "Pieces of evidence must be viewed not in isolation but in conjunction," United States v. Reifler, 446 F.3d 65, 94–95 (2d Cir. 2006), and the court should apply the standard "to the totality of the government's case and not to each element, as each fact may gain color from others," Guadagna,

15

183 F.3d at 130. In addition, "courts must be careful to avoid usurping the role of the jury." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). Courts must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." Reifler, 446 F.3d at 94–95; Guadagna, 183 F.3d at 130 ("[Rule 29] does not provide [a court] with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."); United States v. Rea, 958 F.2d 1206, 1221–22 (2d Cir. 1992) ("[T]he choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the court is] not entitled to second guess the jury's assessments.")

Therefore, courts must (1) "draw all reasonable inferences in the government's favor," United States v. Gagliardi, 506 F.3d 140, 149 (2d Cir. 2007), (2) "resolve all issues of credibility" in the government's favor, United States v. Khan, 787 F.2d 28, 34 (2d Cir. 1986), (3) defer to "the jury's resolution of conflicting testimony," United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) (quotation marks and citations omitted), and (4) recall that "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." United States v. Huezo, 546 F.3d 174, 182 (2d Cir. 2008). Thus, testimony is sufficient to establish a fact and sustain a conviction if it is not incredible on its face. See United States v. Desena, 287 F.3d 170, 177 (2d Cir. 2002); United States v. Jespersen, 65 F.3d 993, 998 (2d Cir. 1995).

"[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" Guadagna, 183 F.3d at 129. Furthermore, "[d]irect evidence is not required; '[i]n fact, the government is entitled to prove its case solely through circumstantial evidence.'" United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008); United States v. Irving, 452 F.3d 110, 117 (2d Cir. 2006) ("A jury

16

may convict on circumstantial evidence alone."). When making a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." Holland v. United States, 348 U.S. 121, 139 (1954); United States v. Rosenthal, 9 F.3d 1016, 1024 (2d Cir. 1993) ("The government need not eliminate every theory of innocence").

The "high degree of deference" given to the jury's verdict "is especially important when reviewing a conviction of conspiracy." United States v. Landesman, 17 F.4th 298, 320 (2d Cir. 2021). "This is so because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. "The 'agreement to participate in the conspiracy may be inferred from the facts and circumstances of the case,' and 'both the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence.'" Id. (quoting United States v. Wexler, 522 F.3d 194, 207–08 (2d Cir. 2008)). "Moreover, 'seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'" Id. (quoting United States v. Mariani, 725 F.2d 862, 865–66 (2d Cir. 1984)). Given this high standard, Rule 29 motions "rarely carry the day." United States v. Tillem, 906 F.2d 814, 821 (2d Cir. 1990).

2.    The Rule 33 Standard

In deciding whether to grant a Rule 33 motion, "[t]he test is whether it would be a manifest injustice to let the guilty verdict stand." James, 712 F.3d at 107. "For a trial judge to grant a Rule 33 motion, he must harbor a real concern that an innocent person may have been convicted." Id.; United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009). Given the rigor of this stringent standard, Rule 33 motions "are disfavored in this Circuit," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and a Court's discretion to grant a Rule 33 motion "should be

17

exercised sparingly and in the most extraordinary circumstances." Landesman, 17 F.4th at 330 (citing United States v. Ferguson, 246 F.3d 129, 131, 134 (2d Cir. 2001)); United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (A court's authority under Rule 33 should only be exercised "in the most extraordinary circumstances"). Defendant bears the burden of meeting this exacting standard. United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).

A court "may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." United States v. Archer, 977 F.3d 181, 188 (2d Cir. 2020) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). And a court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Id. (quotation marks omitted). A court must "defer to the jury's resolution of conflicting evidence," absent "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'" Id. (quoting Ferguson, 246 F.3d at 134); United States v. Van Manen, 2019 WL 5092013, at *2 (S.D.N.Y. Oct. 11, 2019) ("[A] Rule 33 motion is not an opportunity for the district court to alter its general posture of deference 'to the jury's resolution of conflicting evidence and assessment of witness credibility.'" (quoting McCourty, 562 F.3d at 475)).

Courts "must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." Archer, 977 F.3d at 189. It is "only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." Ferguson, 246 F.3d at 134. "An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' and the district court's identification of problematic testimony does not automatically meet this standard." McCourty, 562 F.3d at 476

18

(quoting Sanchez, 969 F.2d at 1414).  "[R]ejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial."  Sanchez, 969 F.2d at 1414.

B.  Discussion

1.  Counts One and Two:  Conspiracy to Traffic Firearms and Firearms Trafficking

a.  Defendant's Threadbare Arguments Fall Far Short of the Rule 29 Standard

Defendant barely mounts a Rule 29 challenge to the firearms trafficking counts, dedicating little more than a paragraph to each.  See Mot. at 10–11.  In sum and substance, he argues that the evidence showed only that he "(1) knew his brother was involved in manufacturing firearms, (2) lent his brother money, (3) provided his email address for a Micro Center coupon, and (4) sent one ambiguous text message about someone wanting to 'buy one.'"  Id.  He claims that these acts are susceptible of innocent explanations rather than "designed to contribute to the success of firearms trafficking."  Id. at 11.  This is Defendant's take on a sliver of the evidence, dependent upon inferences favorable to him.  And while Defendant frames acts like lending money or providing an email address as innocuous, those acts are incriminating when considering Defendant's now-conceded knowledge of the gun trafficking scheme.  See Landesman, 17 F.4th at 320 ("seemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.").  Unsurprisingly, the jury rejected Defendant's claim that he was accidentally part of a scheme to 3D-print machineguns.

Defendant's lack of substantial argument under Rule 29 is understandable.  The evidence against him was far more extensive than his dismissive framing, and a juror could easily convict on Counts One and Two.  The government introduced well over 150 exhibits at trial, including (1) videos showing the defendant shooting ghost guns that his coconspirators assembled, including one with an MCD; a range of text messages in which (2) codefendant Justin Nudelman

19

regularly apprised Defendant about the illegal firearms he was manufacturing; (3) Defendant informed Justin he had found a willing buyer for one of those firearms; (4) Defendant helped Justin buy a third 3D-printer of the same make and model that Justin had been using to manufacture the guns, the morning after Justin gave him a step-by-step visual breakdown of how he did so; (5) Defendant regularly messaged Justin about how much money Justin owed, for the material assistance Defendant provided to make the guns and to sell illegal drugs; (6) coconspirator text messages establishing that Defendant used illegal ghost guns himself; (7) court records establishing Defendant was a convicted felon barred from possessing firearms, establishing his motive to further the illegal conspiracy and demonstrating the willfulness with which he joined; (8) financial records demonstrating that Defendant helped further the illegal cash business by conducting financial transfers not only with Justin, but with coconspirators including Mershon and Daddea; and (9) physical evidence recovered from a home that he visited weekly, where he was caught on camera with Mershon, that had no less than 35 illegal firearms, numerous rounds of ammunition, and four 3D printers.  The jury was also entitled to consider evidence establishing that Defendant conspired to obstruct justice by concealing and destroying evidence of his crimes, as those acts reflect his consciousness of guilt.  See Archer, 997 F.3d at 194 ("Acts that exhibit a consciousness of guilt . . . tend to prove knowledge and intent of a conspiracy's purpose.").

This evidence also corroborated Mershon's testimony, which credibly established that Defendant not only knew about the conspiracy, but willfully furthered it at practically every step.  As detailed above, Mershon's testimony and corroborating evidence proved that Defendant helped define the contours of the conspiracy by agreeing with coconspirators on (1) what firearms and parts to make and sell; (2) how to sell them; (3) the prices at which to sell them; and (4) who to sell to; enabling the illegal manufacturing of the firearms by knowingly funding the purchase of

(5) gun parts and (6) 3D printers; and furthering illegal sales by (7) regularly bringing trusted buyers to Justin Nudelman's home to view the guns and (8) arranging at least one sale that Mershon knew of. This evidence was more than sufficient to convict Defendant on Counts One and Two.

Instead of trying to satisfy the Rule 29 standard, Defendant dedicates almost all of his energy to arguing for a new trial under Rule 33. He effectively hopes that the Court will disregard the jury's verdict and instead side with him on practically every contested inference and credibility finding. First, he argues strenuously for the Court to throw out Mershon's testimony, based on little more than incorrect tangents and the baseless claim that the testimony was coaxed by leading questions. Second, he claims that key evidence that corroborates Mershon's testimony is "equally consistent with innocence," Mot. at 37, pressing an argument that is both factually baseless and legally inadequate. Rule 33 is nearly as demanding as Rule 29, and Defendant does not proffer any of the "extraordinary circumstances" that would justify the drastic remedy of disregarding the jury and redoing the entire trial. The government addresses the flaws in Defendant's arguments as to the testimony and corroborating evidence below.

b. Mershon's Testimony Was Competent, Credible, and Corroborated

Defendant asks the Court to exercise "its independent judgment on credibility" to completely disregard Mershon's testimony, even though the jury evidently credited that testimony. Mot. at 32. To justify this extraordinary request, Defendant claims that Mershon's testimony (1) "was not reliable"; (2) "was elicited through improper leading questions"; and (3) "lacked personal knowledge." Id. at 32–37. Defendant is wrong in all three respects, and none of his arguments present the "exceptional circumstances" that would enable the Court to "intrude upon the jury function of credibility assessment," Ferguson, 246 F.3d at 134, such as a finding that Mershon's testimony was "patently incredible or defie[d] physical realities." McCourty, 562 F.3d at 476.

21

i.    Mershon's Testimony Was Reliable

Defendant's claim that Mershon was unreliable hinges on three examples: (1) that Mershon interpreted a text message about Defendant helping Justin Nudelman buy a 3D printer as saying "[Defendant] 'picked up the 3D printer for Justin'"; (2) that Mershon must have lied about assembling a gun with an MCD that Defendant fired because "Justin did not obtain a 3D printer until April 30, 2023" and therefore "would not have had access to a [MCD] when the recording was made" three months earlier; and (3) that Mershon's testimony that Defendant sold a firearm to an associate named Bobby "did not make sense" and was "hard to follow." Mot. at 32–33. These arguments all depend on Defendant's own misunderstanding of the evidence and misreading of the record. Not one shows that Mershon's testimony was unreliable, and not one warrants the extraordinary step of disregarding the testimony and the jury's assessment that it was credible.

First, the record undercuts Defendant's outsized emphasis on Mershon's suggestion that he picked up a printer. Mershon misspoke, as he later clarified that he did not know whether Defendant "went to Micro Center to pick up a printer for Justin on August 16th, 2023." Trial Tr. 221–222. The point is also irrelevant. The verdict did not depend in any way on the impression, mistaken or otherwise, that Defendant personally picked up a 3D printer. The government even addressed this in rebuttal. See Trial Tr. 897 ("[W]ho cares who picked up the printer from Micro Center and brought it back to 28 Corona Avenue. We didn't argue that the defendant drove over there and shipped it back. We argued that he helped Justin and [Mershon] buy it, because that's what the evidence actually showed. Whether the defendant picked up a printer . . . isn't the point."). Defendant's choice to harp on this tangent, rather than the bulk of the incriminating testimony against him, just betrays that Mershon's testimony was reliable in every respect that mattered.

22

Second, Defendant's claim that Justin Nudelman and Mershon could not have had an MCD before April 30, 2023 is at odds with the record. Defendant's argument depends on the assumption that every MCD possessed during the course of the charged conspiracy was made using one of Justin's printers. That assumption is false. As the Court may recall, the government moved in limine to admit videos showing the coconspirators with MCDs in late 2022. See ECF No. 106 at 7–8. One of those videos showed Justin manipulating an MCD and attaching it to a Polymer80 firearm later recovered from his house. See GX 701-003; Trial Tr. 656–57. Another of those late 2022 videos showed Mershon firing a gun with an MCD at the exact same location that Defendant was videotaped doing so just three months later – open land by Daddea's home. See GX 716. That is entirely consistent with Mershon's testimony, which Defendant does not even attempt to address. See Trial Tr. 148–50 ("I was shooting a Glock style pistol with a conversion device attached to it. . . . This is a video of the same pistol that I was just using at Michael Daddea's neighbor's house, and Brandon, the defendant, is operating the machine gun."). Defendant also fails to acknowledge that Mershon's testimony was corroborated by expert witness Nino DeMarco, who independently testified that Defendant appeared to be shooting a Polymer80 pistol equipped with an MCD. Trial Tr. 660–61; GX 1700 at 76. Mershon's testimony was perfectly reliable.

Third, Defendant's conclusory claim that Mershon's testimony about a gun sale was "hard to follow" does not come close to the kind of extraordinary circumstance that merits disregarding Mershon's testimony. Defendant may have had trouble understanding it, but the jury did not. Indeed, Defendant does not address much of Mershon's testimony regarding the sale, which established personal interactions between him, Justin, and Bobby, the poor relationship between Justin and Bobby (which required Defendant to broker the sale), the gun that Bobby purchased, and text messages corroborating the sale. See Trial Tr. 164–68. Ultimately,

23

Defendant's argument that Mershon did not witness the sale merely goes to the weight of Mershon's testimony. That is the kind of credibility assessment that juries regularly make, not an extraordinary circumstance that warrants disregarding the jury's assessment.

The three examples chosen by Defendant, and Defendant's failure to address the bulk of Mershon's other incriminating testimony, demonstrate that Mershon's testimony was reliable. The jury was entitled to credit Mershon, and these arguments do not warrant a new trial.

ii.      The Government Did Not Improperly Lead Mershon

Defendant next claims that Mershon's testimony should be disregarded because "much of it was obtained with leading questions." Mot. at 34. In support, he identifies two instances where the government asked if Defendant "share[d] an interest in guns" with Mershon, and a handful of questions in which the government asked "how, if at all" Defendant helped further the conspiracy. Id. at 35. These questions were not leading, and they do not warrant relief regardless. Courts have shown an "almost total unwillingness to reverse" verdicts based on leading questions, and this case is not the extraordinary exception. United States v. Ajmal, 67 F.3d 12, 16 (2d Cir. 1995); United States v. Estevez, 735 F. App'x 746, 747 (2d Cir. 2018).

None of the questions that Defendant cites were leading. "The essential test of a leading question is whether it so suggests to the witness the specific tenor of the reply desired by counsel that such a reply is likely to be given irrespective of an actual memory. . . . [A] leading question is one that puts answers in the mouth of the witness." United States v. Mejia-Ramos, 798 F. App'x 749, 753 (4th Cir. 2019) (cleaned up); Quarshie v. Garland, No. 19-2519, 2022 WL 4454530, at *2 (2d Cir. Sept. 26, 2022) ("[L]eading questions . . . are questions that suggest a particular answer. The IJ's questions were clear and direct, sometimes requiring a yes-or-no answer, but they in no way steered Quarshie to certain responses.").

24

To start, the two questions about whether Defendant had an interest in guns did not put words in Mershon's mouth "irrespective of an actual memory." The bulk of Mershon's testimony and evidence corroborating Defendant's possession of guns placed this baseline proposition beyond dispute. And while the Court instructed the government not to lead the witness in these two isolated instances, Trial Tr. 35, it properly exercised its broad discretion not to strike the testimony. See, e.g., Estevez, 735 F. App'x at 747 ("[T]he language of Federal Rule of Evidence 611(c) expressing a preference for non-leading questions is only precatory and . . . generally trial judges are afforded a large degree of discretion in overseeing the examination of witnesses."). That decision was entirely sensible. Even if these two questions were leading, they were proper questions meant "to develop [Mershon's] testimony" and orient the jury to more substantive testimony to come. United States v. Salameh, 125 F.3d 88, 128 (2d Cir. 1998); Quarshie, 2022 WL 4454530 at *2 ("[E]ven under Rule 611(c), leading questions are not categorically banned on direct examination; they are merely disfavored, subject to sensible regulation by the presiding judge 'as necessary to develop the witness's testimony.'").

The "how, if at all" questions were not leading, either. Defendant did not object to most of the questions that he now claims are leading, and the Court overruled him in the only two instances that he actually did object. See Mot. at 35; Trial Tr. 43, 47–49, 85. The Court's decisions on those objections were correct. These open-ended questions did not reveal "what answer the government was seeking to elicit or otherwise put words in [Mershon's] mouth." Mejia-Ramos, 798 F. App'x at 753 (rejecting claim that question "[W]hat, if anything, did [the defendant] say to you about firearms" was leading). Mershon could have answered in any number of ways, including by denying that Defendant furthered the conspiracy at all.

25

Finally, even assuming arguendo that the questions were leading, they were not problematic enough to warrant a new trial. See, e.g., United States v. Reynosa, No. 22-1321, 2022 WL 17485956, at *4 (3d Cir. Dec. 7, 2022) ("Although leading questions should generally not be used on direct examination . . . district courts have discretion to allow even a large number of leading questions so long as the questions are not so flagrant as to vitiate the integrity of the trial.") (internal quotation marks and citation omitted); United States v. Templeman, 965 F.2d 617, 619 (8th Cir. 1992) (stating that leading questions "were not so numerous, nor were they so suggestive, that they crossed the fine line between stimulating an accurate memory and implanting a false one. Nor did those questions deprive the jury of the ability to weigh the witnesses' testimony and credibility." (citations and quotation marks omitted)). This argument does not warrant a new trial.

### iii.    Mershon's Testimony Was Based on Personal Knowledge and Admissible Coconspirator Statements

Finally, Defendant argues that Mershon's testimony should be set aside because in three instances – the purchase of two 3D printers and the sale of a firearm to Bobby – Mershon's knowledge of Defendant's involvement derived in part from statements made by Justin Nudelman. Mot. at 36–37. That is no basis to usurp the jury's role, either. Coconspirators do not need to witness every action that the other takes. Justin's coconspirator statements were all admissible and admitted, and Mershon could rely on them in much the same fashion as the jury could. See, e.g., United States v. Torres, 124 F.4th 84, 99–100 (2d Cir. 2024) ("[C]o-conspirator statements are not subject to the personal knowledge requirement of Rule 602."). As noted above, to the extent that Mershon did not personally witness some of Defendant's overt acts in furtherance of the conspiracy, Defendant had an opportunity to cross-examine Mershon on this point (and did), and the jury could weigh that fact when assessing Mershon's credibility. The jury evidently, and reasonably, considered Mershon credible regardless.

26

Defendant also does not attempt to address the many instances where Mershon testified about personally observing Defendant participate in the gun trafficking conspiracy: watching his coconspirators 3D print guns, handling the guns, providing advice on what guns to make, arguing with Justin Nudelman over the repayment of money that Defendant knew Justin was using to buy gun parts and drugs, bringing potential buyers to see the illegal guns, and helping dispose of a gun and drugs with Mershon shortly after Justin's arrest. That testimony was all based upon personal knowledge and substantially corroborated. Text messages between Defendant and Justin and the Micro Center records establish Defendant's role in buying one of the 3D printers. And Defendant is caught in text messages discussing a gun sale with Justin. The notion that Defendant deserves a new trial simply because Mershon didn't personally see Defendant hand a gun to Bobby is at odds with the record and the demanding requirements of Rule 33.

        c.        <u>The Documentary Evidence Plainly Favored the Jury's Verdict</u>

Recognizing that documentary evidence supported Mershon's testimony, Defendant tries to dismiss that evidence by arguing it is "equally consistent with innocence." Mot. at 37–39. That is not the standard. Rule 33 requires that the evidence "preponderate[] heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand," bearing in mind that the Court must "defer to the jury's resolution of conflicting evidence," absent "a situation in which the evidence was 'patently incredible or defie[d] physical realities.'" <u>Archer</u>, 977 F.3d at 188. Defendant does not come close to clearing that bar. Instead, he merely asks the Court to ignore the jury and adopt his view of the evidence instead. All four examples that he relies upon are easily dismissed, and none of them warrant a new trial.

<u>First</u>, Defendant claims that the many text messages that Justin Nudelman sent him about the conspiracy show only "knowledge, not participation," because Defendant did not

27

respond in some instances.  Mot. at 37–38.  But Defendant forgets that "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  Landesman, 17 F. 4th at 320.  That is precisely why the "high degree of deference" given to the verdict "is especially important when reviewing a conviction of conspiracy."  Id.  Defendant's claim that his silence reflects "a disinterested recipient" is merely an inference that he unsuccessfully argued.  The jury's rejection of his claim is unsurprising, because the jury reviewed this evidence within the context of the whole trial rather than in isolation.  There was plenty of evidence demonstrating Defendant's knowing and active participation in the trafficking scheme, like videos showing him shooting MCDs, the recovery of at least 35 illegal guns, testimony establishing that he met with Justin and Mershon at the same location to discuss the trafficking scheme and bring potential buyers on a weekly basis, text messages showing him assist Justin with buying 3D printers, and obstructive acts showing his consciousness of guilt on the day of Justin's arrest.

And even Defendant cannot ignore the most damning evidence to the contrary, which showed that he did reply to Justin's messages to confirm that he had found a buyer for one of the illegal firearms, just one minute after Justin sent him an image of them.  GX 100AC.  As he did at trial, Defendant argues that this highly incriminating evidence should be ignored because it is allegedly "ambiguous" and does not identify what "one" refers to.  This argument strains credulity.  There is nothing ambiguous about the message; the context makes crystal clear that Defendant was directly responding to the image of firearms that his coconspirator had just sent him.  If there was context missing from this exhibit, Defendant could easily have moved under the rule of completeness to place that information before the jury.  He did not do so, because he could

28

not do so.  The jury drew the only reasonable, natural inference from the evidence: that Defendant knowingly and willfully arranged illegal gun sales in furtherance of the conspiracy.

Second, Defendant claims his financial transactions were "consistent with familial support" rather than criminal activity, and that the "money flowed in one direction: from [Defendant] to Justin."  Mot. at 38.  As discussed below in Section VI, that is another inference that Defendant argued at trial and the jury rejected.  Defendant wanted Justin to pay him back, as counsel conceded in closing.  See Trial Tr. 864.  And as Defendant conceded in opening and closing arguments, Justin only made money through illegal gun and drug sales.  Defendant now concedes that he knew about the gun trafficking scheme, too.  It was perfectly reasonable, and in fact natural, to infer that Defendant expected Justin to pay him back through the proceeds of illegal gun and drug sales.[1]

Third, Defendant claims the Court should disregard the videos of him shooting illegal guns along with Justin Nudelman and Daddea because "Mershon's testimony that he and Justin together assembled a gun equipped with a switch is factually impossible given the timeline and their lack of access to switches prior to obtaining 3D printers."  Mot. at 39.  As discussed above, Defendant's argument is based on a false premise.  These videos did not just show that Defendant "fired a gun," either — they tied him directly to all three of his codefendants and the firearms that they were assembling for sale, including dangerous, illegal MCDs.  Defendant's claim that this evidence is "equally consistent with innocence" cannot be taken seriously.

Finally, Defendant claims that the Micro Center records only "reflect[] Justin's use of [Defendant]'s information – not [Defendant]'s knowing participation in purchasing equipment

---

[1] The money did not just flow from Defendant to Justin, either.  Defendant does not even try to address evidence of his financial transactions with other coconspirators like Daddea and Mershon.  See GX 1200H.

for a firearms manufacturing operation." Mot. at 39. This is another reductive argument that depends upon ignoring the broader record. Justin did not simply use Defendant's information; Defendant gave Justin that information after Justin explained he would use it to buy a new 3D printer. And that message came not even a day after Justin showed Defendant how he was using 3D printers and gun parts from eBay to assemble guns like the Diamondback 380 – one of the small, concealable handguns that Defendant encouraged Justin to build. In context, there is nothing innocent about Defendant's role in buying Justin a third model of the same printer that Defendant knew Justin was using to make guns for sale. See Landesman, 17 F.4th at 320 ("'[S]eemingly innocent acts taken individually may indicate complicity when viewed collectively and with reference to the circumstances in general.'" (quoting Mariani, 725 F.2d at 865–66)).

Ultimately, Defendant cannot meet the demanding standards of either Rule 29 and Rule 33. Extensive evidence established his role in the firearm trafficking scheme beyond a reasonable doubt, and there is no "real concern that an innocent person may have been convicted." James, 712 F.3d at 107. The jury's verdict on Counts One and Two should be affirmed.

2.      Count Three:  Conspiracy to Obstruct Justice

The evidence at trial was more than sufficient to support the verdict that Defendant conspired to obstruct justice, as well. As detailed above, the government presented a range of evidence including (1) the testimony of multiple eyewitnesses establishing that Defendant hid Justin Nudelman's phone in his pocket when officers were not looking and produced it only when Mazur informed officers Defendant was leaving with the phone; (2) body camera footage catching Defendant in a series of lies about Justin's location, right after officers found 35 firearms in Justin's home nearby; (3) phone records revealing that Defendant was on the phone with Justin for over two hours, while officers vainly tried to find Justin at the hospital that Defendant misled them to waste time searching; (4) text messages from the phone revealing that Defendant knew which

30

hospital Justin was at all along; (5) Cellebrite extractions revealing that Justin deleted his conversation with Defendant and every other significant coconspirator during that phone call; and (6) the heavily damaged phone itself, which Defendant reluctantly produced when officers confronted him, and which was in fact Justin's phone.  A jury could and did undoubtedly conclude that Defendant conspired to destroy or conceal Justin's phone and its contents on these facts.  That is all that Rule 29 requires, and Defendant's motion must be denied.

Despite this overwhelming evidence of guilt, Defendant argues for an acquittal based on three claims:  (1) that "no evidence showed that [he] agreed to the deletions"; (2) that his "conduct at the hospital was equally consistent with cooperation"; and (3) that his "statements to police were not lies."  Mot. at 12–14.  These arguments are contrary to the facts, inconsistent with the law, and dependent upon inferences that the jury rejected.  They certainly do not warrant the extreme remedy of invalidating the jury's verdict and ordering a new trial.

First, Defendant argues that the jury could not infer that he encouraged deleting evidence of his crimes because "there is no evidence of what was said during the call" and "no evidence to support that [Defendant] even tipped off his brother to the NYPD's search."  Mot. at 12.  That argument misstates the standard and ignores the broader proof of Defendant's corrupt intent.  Viewed in light of the full record, the jury could easily infer that Defendant encouraged deleting evidence of his crimes.  After all, the phone call (1) lasted an unusually long duration of two hours; (2) immediately after officers searched Justin Nudelman's home for evidence of firearms trafficking; (3) continuing through two encounters where Defendant is captured on body camera lying to officers about where Justin is and how often they interact; (4) at the very same time that Justin deleted evidence not only of his interactions with Defendant, but with every other major coconspirator (with Justin deleting his conversations with Defendant less than thirty seconds

31

apart from one of those coconspirators).   Adding to that (5) the evidence that Defendant participated in the firearms trafficking scheme; (6) his efforts to personally sneak Justin's phone out of RUMC after he saw officers ask Justin for it; (7) Detective Molinaro's testimony that the damaged phone would not turn on, despite evidence that Justin used it less than two hours earlier; and (8) the extensively damaged phone itself, it was reasonable to infer that Defendant encouraged Justin to delete, destroy and conceal evidence of their wrongdoing by any means.

Second, Defendant claims his conduct was "equally consistent with cooperation" because he "drove the police to the hospital, was present when Justin was arrested, and – according to Mazur – handed the phone to officers when confronted." Mot. at 13. This argument is easily dismissed. The standard is not whether the evidence was "equally consistent with cooperation." The standard is whether *any* reasonable jury could find Defendant guilty, with *all* reasonable inferences drawn in the government's favor.  The evidence cited above readily clears that low bar.

Defendant's conduct was not "equally consistent with cooperation," regardless. Defendant reductively misrepresents the government's case by claiming its theory was merely that Defendant "took Justin's phone and attempted to destroy it." Mot. at 13.  That argument fails to address extensive evidence that Defendant tried to get away from officers with Justin Nudelman's phone hidden in his pocket.  It is undisputed that (1) Defendant took Justin's phone after officers asked Justin to produce it pursuant to a warrant; (2) Defendant did so precisely when no officer was in the room to see it; (3) Defendant then hid the phone in his pocket rather than keeping it out in the open; (4) Defendant withheld from the officers, who had asked for the phone right in front of him, that he had the phone; (5) Mazur told the officers that Defendant took the phone because he thought Defendant was trying to leave the hospital with it; and (6) that Defendant only handed over the phone when Detective Uske confronted him about it.  Trial Tr. 372–74, 760–68; GX

32

1501B.  The jury could easily convict Defendant on this theory alone, independent of evidence that he tried to break the phone.  Defendant's failure to even address these facts is independently sufficient to deny his Rule 29 and 33 motions as to Count Three.

Regardless, the evidence allowed the jury to infer that Defendant tried to break Justin Nudelman's phone as well.  Defendant claims that Mazur's testimony was "equivocal at best" because he did not directly observe Defendant break the phone, and that the phone "could have been damaged in Justin's motorcycle accident, by Justin himself when he learned police were searching his home, or by being dropped."  Mot at 13.  None of this warrants relief under Rule 29.  First, even assuming that Mazur's testimony was equivocal, assessment of credibility is within the province of the jury.  And bearing in mind that all inferences are drawn in favor of the verdict, the jury plainly found Mazur's testimony credible enough to convict.

Mazur's testimony was not "equivocal" either.  He testified that while he did not see Defendant break the phone, he saw Defendant take the phone from Justin Nudelman and heard a distinct cracking sound almost immediately after.  There is nothing equivocal about that.  On the contrary, Mazur's observation was corroborated by the undisputed fact that Defendant pulled the heavily damaged phone out of his pocket only when Mazur told officers what he observed.  And Defendant's claims about how the phone might have been damaged are both speculative inferences that the jury rejected and contrary to the evidence.  The jury could readily and reasonably infer that Defendant caused the extensive damage to the phone given that (1) Justin used the phone to contact Defendant after the search of his home, ruling out destruction during the motorcycle accident weeks earlier or the search of the home earlier in the day; (2) the phone's screen was severely cracked, with one corner bent and warped, far beyond what one might expect from a phone that was dropped from the height of a hospital bed; (3) Justin was bedridden with one arm

33

in a cast, limiting his ability to cause such extensive damage; and (4) Mazur's testimony that he heard a distinct sound of glass cracking almost immediately after Defendant took the phone. This evidence was not just sufficient to sustain a conviction; its overwhelming weight supported the conviction. See United States v. Mulder, 273 F.3d 91 (2d Cir. 2001) ("We must be especially deferential when reviewing a conspiracy conviction.").

Third, Defendant claims in a terse paragraph that he did not lie about Justin Nudelman's location because his claim that Justin was at SIU North was "consistent with an honest mistake." Mot. at 13–14. Yet again, that is not the standard. That is an inference that Defendant argued in closing and the jury rejected. See United States v. Jimenez, 96 F.4th 317, 325 (2d Cir. 2024) (noting that courts must generally defer to the jury's choice of the "competing inferences that can be drawn from the evidence"). The evidence showed Defendant knew that Justin was at RUMC for well over a week before he spoke to the officers. And while one might honestly mistake the hospital at first, that argument was not credible when body camera footage showed Defendant maintain that Justin was at SIU North despite (1) Detective Molinaro explicitly asking whether Justin was at "Richmond North," i.e. RUMC; (2) repeated requests to confirm that Justin was at SIU North during the initial encounter at 5 a.m.; and (3) officers' explanation at 7 a.m. that they did not find Justin at SIU North. Any one of these facts would have prompted Defendant to remember that Justin was at RUMC; in combination, these three facts would have compelled it. Defendant purposefully, falsely insisted that Justin was at the wrong hospital.

Finally, Defendant does not even attempt to make an independent Rule 33 argument. Instead, he merely summarizes his arguments that the government's case "rests on Mazur's equivocal testimony about events in a chaotic hospital room, a phone of unknown provenance and unknown damage history, and an inference of corrupt agreement drawn from a

34

phone call about which there is no evidence of content." Mot. at 40. For the reasons detailed above, that does not come close to the "manifest injustice" required to throw out the jury's verdict. The evidence does not preponderate against the verdict, and it does not warrant a new trial.

II.    Defendant Had a Full and Fair Opportunity to Cross Examine Detective Molinaro, and There Is No Prejudice Warranting a New Trial

Defendant next argues that the government violated the Jencks Act and Brady v. Maryland, 373 U.S. 83 (1963), because (1) the government did not disclose a DD5 documenting the execution of the search warrant at Justin Nudelman's home (the "DD5") before cross examination of Detective Molinaro, and (2) because the government purportedly did not reveal "that Molinaro reviewed the entirety of the DVR footage and saw nothing tying [Defendant] to the firearm manufacturing business." Mot. at 16 & n.2. Neither basis warrants a new trial.

The government did not violate either the Jencks Act or Brady. First, the DD5 was an unremarkable summary of a search warrant execution, possessing minimal relevance or impeachment value at trial. See Ex. A. The DD5's minimal impeachment value was cumulative at best, and the government produced it promptly upon request regardless. Second, the government disclosed the DVR footage that Detective Molinaro reviewed, which allowed counsel to cross examine him on the purported lack of evidence tying Defendant to the scheme on that device. Defendant identifies no legal basis for his claim that the government had an added duty to explain who personally conducted the review of the DVR footage, to what extent they did so, and what favorable inferences Defendant could draw from that review.

In short, the government did not suppress any Brady material or statements subject to the Jencks Act. Defendant had ample opportunity to cross-examine Detective Molinaro on both the DD5 and DVR footage at trial. Defendant took advantage of that opportunity, recalling Detective Molinaro to cross-examine him based on the allegedly suppressed information. And the

35

Court repeatedly instructed the jury that the government caused the belated disclosure of the DD5, to preclude the remote possibility that the jury somehow based its verdict on how prepared or unprepared defense counsel looked. Defendant cannot show prejudice under these circumstances, let alone that it would be a "manifest injustice" to let the verdict stand.

A.    Applicable Law

"After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any [relevant prior] statement." 18 U.S.C. § 3500(b). Once the motion is made and granted, the government violates the Jencks Act only if it "elects not to comply with [the] order of the court." 18 U.S.C. § 3500(d). And there are "three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." United States v. Hunter, 32 F. 4th 22, 30–31 (2d Cir. 2022).

B.    Discussion

1.    There Was No Violation of Brady or the Jencks Act

Defendant claims that the government violated Brady and the Jencks Act for two reasons. First, he claims that the DD5 was "powerful impeachment material" because it "contained no mention of [Defendant], no mention of the visits to [his] home, no mention of the hospital search, and no mention of the recovery of Justin's phone from Detective Uske via [Defendant]." Mot. at 16. Second, he concedes that the government produced DVR footage and the search warrant detailing the scope of its review, but he claims the government nonetheless violated Brady because it "did not reveal that Detective Molinaro had reviewed the entirety of the footage and did not reveal the absence of any footage showing [Defendant] engaged in Justin and Ronnie's

36

firearms manufacturing business." Id. at 16 n.2.  Defendant has not established a violation of Brady or the Jencks Act in either respect.

First, Defendant cannot establish that the government violated the Jencks Act. When counsel noted that the DD5 had not been produced, the government promptly complied with the Court's order to produce it.  And the Act requires disclosure only upon "motion of the defendant" after the witness "has testified on direct examination." See, e.g., United States v. Scotti, 47 F.3d 1237, 1250 (2d Cir. 1995) (holding that a defendant "is only entitled to production of [3500 material], or to a determination whether they must be produced, if he makes a timely and sufficient motion"); United States v. Daly, 125 F.3d 845 (2d Cir. 1997) ("[M]otions for disclosure of [3500 material] must be made at a time reasonably proximate to the witnesses' direct examination, preferably immediately before, during, or after their testimony."); United States v. Percevault, 490 F.2d 126, 129 (2d Cir. 1974) ("[T]he prosecution cannot be compelled to disclose statements of the witness before he has testified on direct examination . . . This unique but limited discovery device represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial."). The government disclosed the statements upon request, which is what the Jencks Act requires.

Second, there is no Brady violation, for multiple reasons.  To start, the DD5 is immaterial, as its relevance and impeachment value were minimal.  See Ex. A.  The DD5 has hardly a page's worth of substantive content, as its narrative simply notes (1) that officers made a forced, no-knock entry into Justin Nudelman's home; (2) executed a search warrant; (2) arrested Justin; (4) recovered evidence from his person and home; and (5) listed personnel who were present for or notified of the search. See id. at 2.  It is not at all clear why the DD5's focus on the execution of the search warrant and arrest, rather than Defendant's statements, is impeaching.  As

37

Detective Molinaro explained, a DD5 is just "a summary . . . literally a paragraph or a long sentence," rather than a blow-by-blow account of every event on a given day. Trial Tr. 393. And as he explained, and the Court recognized, the DD5 need not capture details that were recorded elsewhere, like body camera footage. See Trial Tr. 389, 533 (Court noting "a lot of things that [the detective] talked about are videotaped. At least some of the . . . more salient things"); 723 (Molinaro testifying the DD5 did not contain details that were on body camera); 741 (same). That the DD5 focused on the basic details of the search warrant and arrest, rather than every one of Defendant's wrongful acts, says nothing about Defendant's guilt or innocence.

At best, the DD5 was merely cumulative of other reports that Defendant had already used to try and impeach Detective Molinaro. And as Defendant concedes, Brady information is material only where "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Hunter, 32 F.4th at 30-31. Under Brady or the Jencks Act, there is no reasonable probability of a different result where the impeachment material at issue is substantially cumulative. See, e.g., Turner v. United States, 582 U.S. 313, 327 (2017) (affirming denial of Brady claim and motion for new trial where "[w]ith respect to the undisclosed impeachment evidence, the record shows that it was largely cumulative of impeachment evidence petitioners already had and used at trial"); United States v. Sessa, 711 F.3d 316, 321 (2d Cir. 2013) (rejecting Brady claim and motion for new trial based on undisclosed NYPD reports where "as evidence to impeach [the witness's] credibility, it was cumulative of abundant other evidence"); United States v. Nicolapolous, 30 F.3d 381, 384 (2d Cir. 1994) (rejecting Jencks Act claim where "there appear[ed] to be no non-cumulative use that [defendants] could have made of the [statements] in attacking [the witness's] credibility," and the evidence was "useful to the defense only insofar as it furthered the impeachment").

38

The DD5 merely supported a theory that counsel was already pursuing during the initial cross examination.  For example, before receiving the DD5, counsel already questioned Detective Molinaro about a range of other NYPD reports that did not name Defendant or describe the details of NYPD conversations with him at his home or the hospital.  See, e.g., Trial Tr. 415 ("Q.  You were asked about vouchers and arrest reports and a complaint report that you filled out following the search and the events of September 7th. None of those reports referenced Brandon Nudelman, did they?  A. No, ma'am.").  The DD5 was just one more report that followed this pattern, and cross-examination about it was merely additive to the theory Defendant had already presented.  That does not establish materiality or prejudice, under either Brady or Section 3500.

Defendant also had an adequate opportunity to use the DD5 at trial regardless.  See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001) (reiterating "the longstanding constitutional principle that as long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner").  The Court allowed Defendant to recall Detective Molinaro for cross-examination whenever counsel felt ready.  Defendant took that opportunity, proving he could effectively use that information at trial.  Indeed, Defendant explicitly cross-examined Detective Molinaro on every detail that he now describes as "powerful impeachment material":  that the DD5 did not mention the encounters at Defendant's house, the details of the hospital visit, or Defendant's name.  See Trial Tr. 723–724.  The jury considered all of this "powerful impeachment material" and convicted anyway.  The DD5 is immaterial, and there is no reason to believe that earlier disclosure would reasonably have led to an acquittal.

Third, Defendant's claims about Detective Molinaro's review of the DVR footage fare no better.  To start, the government did not suppress Brady material.  It produced the DVR

footage that it considered responsive and the search warrant detailing the scope of its review (and by extension, the scope of the material that it considered nonresponsive) ahead of trial. The government then produced the full DVR image to Defendant pursuant to the Court's order at trial, giving Defendant an opportunity to review and prepare for further cross-examination of Detective Molinaro based upon the full DVR footage when ready. See Trial Tr. 631–32. Defendant then took advantage of the opportunity to cross-examine Detective Molinaro based on the purported "absence of [incriminating] footage," thoroughly questioning the witness about his review of the DVR and noting many instances where Defendant was not seen in the footage. See, e.g. Trial Tr. 725, 731–34, 739–40. The jury considered this evidence and convicted anyway.

Defendant identifies no basis for the proposition that the government had a further duty to disclose that Detective Molinaro personally conducted the review of the DVR footage, or the extent to which he did. There is none. To the contrary, "there is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." United States v. Sessa, 711 F.3d 316, 322 (2d Cir. 2013) (rejecting claim that government was obliged to disclose that it "checked latent fingerprints" that failed to yield matches for defendant). Ultimately, Defendant's claim that the DVR footage did not tie him to the conspiracy was an inference that he could argue, not Brady material that the government had to disclose. See, e.g., United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987) (while government must disclose facts needed to take advantage of exculpatory evidence, "it is not required to draw inferences from that evidence which defense counsel is in an equal position to draw"). That claim is also based on a false premise regardless, as the government introduced DVR footage showing Defendant with Mershon, searching for drugs in all the locations where the conspirators kept materials used to manufacture firearms. See GX 1004A. The jury considered

40

the allegedly suppressed information, heard Defendant's arguments about what conclusions to draw, and determined he was guilty anyway. Defendant does not get a new trial simply because the jury rejected his preferred narrative. There is no Brady violation, no Jencks Act violation, and no "real concern that an innocent person may have been convicted." James, 712 F.3d at 107.

2.      There Was No Prejudice

Even assuming arguendo that Defendant established the suppression of material information, he fails to show prejudice. On the contrary, the Court thoroughly mitigated any potential prejudice by letting Defendant recall Detective Molinaro for further cross-examination whenever counsel felt prepared to do so. See Trial Tr. 417 (providing Molinaro would be available for cross-examination the following day); 478 (allowing counsel the weekend to prepare before recalling Molinaro). The Second Circuit has consistently approved this exact approach for over sixty years. See, e.g., United States v. Cantoni, No. 19-4358, 2021 WL 5829754, at *3 (2d Cir. Dec. 9, 2021) (affirming verdict where "after the late disclosure of the § 3500 material, Cantoni was permitted to recall Detective Giuca to the stand, mitigating any prejudice caused by the late disclosure"); United States v. Burden, 112 F. App'x 111, 113 (2d Cir. 2004) (affirming denial of new trial where "the defendant was offered the opportunity to have [a witness] recalled for cross-examination on the basis of" later-produced material); United States v. Pope, 574 F.2d 320, 326–27 (2d Cir. 1978) (affirming denial of new trial where court "concluded that the government error was curable and in fact cured by the remedy he provided in permitting the proofs to be reopened so that [the witness] could be further cross-examined on the basis of the omitted statement"); United States v. Guerra, 334 F.2d 138, 142 (2d Cir. 1964) (affirming where "the defense was perfectly free to recall [two government agents] if the Jencks material subsequently produced . . . would have materially aided in the cross-examination of these two agents"). If the government's

41

subsequent disclosure of the DD5 risked any prejudice, the Court's remedy of recalling Detective Molinaro rendered that prejudice "curable and in fact cured." Pope, 574 F.2d at 326–27.

Defendant barely acknowledges this well-established approach, arguing cursorily that the "damage could not be undone by recalling the witness." Mot. at 17. But his superficial claim identifies only two reasons that recall might be inadequate: (1) that "counsel would have pursued an entirely different cross-examination strategy had the reports been available from the outset"; and (2) that the "jury had already observed defense counsel appear to be caught off-guard by the existence of a document she should have had." Id.

Defendant's first basis for claimed prejudice is conclusory. He never explains what this hypothetical, "entirely different" cross-exam would have looked like. The record provides no basis to divine this "entirely different" theory, either. On the contrary, Defendant's only theory for claiming the DD5 or DVR footage was impeaching is (1) that the DD5 "did not document any of the events that formed the basis of the obstruction charge," and (2) the purported fact that Detective Molinaro "reviewed the entirety of the DVR footage and saw nothing tying [Defendant] to the firearm manufacturing business." Mot. at 16. As detailed above, that is the same exact theory that he already developed at trial.

The second type of alleged prejudice is even flimsier. Counsel cannot seriously argue that "appear[ing] to be caught off-guard" is the kind of "manifest injustice" that warrants redoing a weeklong trial. James, 712 F.3d at 107. That failure alone warrants denial. The premise is also flawed, as the Court rightly observed that the jury did not have that impression. Trial Tr. 534 (noting "the jury is not left with the impression, which can be the case, that you have built an entire case on [Detective Molinaro's] failure to fill out certain forms"); 535 ("There are all sorts of ways to remedy that impression to the extent you think the jury has it. It's not my view that they

42

do. . . . I don't view this as something that just can't be undone.  I really don't."); 536 ("there are situations where somebody can do a cross examination of a witness and, you know, it looks like their whole case depends on it and then it turns out it's not true. That's not what happened here.").

Even so, the Court went above and beyond to preclude the vanishingly small chance that the jury found Defendant guilty just because his lawyer "appeared to be caught off-guard." Trial Tr. 626 (observing that "to avoid the even remote possibility that the jury might blame her for her questions, which under these circumstances I don't think is likely, [] I think it might be appropriate for me to give a charge either before the witness comes back or in my final charge or both").  The Court thus instructed the jury before recalling Detective Molinaro that counsel did not have the reports during the start of cross exam because the government had not provided them earlier.  Trial Tr. 715.  The law presumes such curative instructions are effective, and there is no reason to doubt they were here.  See Zafiro v. United States, 506 U.S. 534, 540–41 (1993); United States v. Reyes, 18 F.3d 65, 71 (2d Cir. 1994) ("Ordinarily we assume that juries will follow limiting and curative instructions."); United States v. Rahim, 339 F. App'x 19, 24 (2d Cir. 2009).

Indeed, the Court even took pains to give this instruction a second time, just before jury deliberations, to further ensure that any misimpression about counsel's competence would not influence the verdict.  See Trial Tr. 942.  The notion that the jury would disregard the Court's repeated instructions and convict Defendant just because his lawyer "appeared to be caught off-guard" disrespects the jury's intelligence.  In light of these specific, repeated curative instructions, the defendant cannot meet his "heavy burden" of showing prejudice so severe that it denied him the right to a fair trial.  Coplan, 703 F.3d at 87.

III.     The Government Did Not Constructively Amend the Indictment

Defendant next claims that the government constructively amended Count Three of the Second Superseding Indictment, which charged him with conspiracy to obstruct justice.

43

According to Defendant, because Count Three charged a conspiracy to "destroy or conceal [Justin Nudelman's] phone and its files," the government could not introduce evidence showing him "lying to law enforcement officers . . . misdirecting officers to the wrong hospital . . . [or] buying time for Justin [Nudelman] to delete text messages." Mot. at 18. As Defendant would have it, "[l]ying to police officers is not altering, destroying, mutilating, or concealing a phone," and therefore constitutes a different theory of obstruction. Id. at 19.

Defendant ignores that "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment." United States v. Heimann, 705 F.2d 662, 666 (2d Cir. 1983). His lies to police officers are not a materially different theory of obstruction. As detailed below, evidence of his lies (1) provides background and context for how Defendant and the officers arrived at the hospital where the phone was; (2) demonstrates another means by which he aimed to conceal the evidence on Justin's phone, and (3) reflects the knowledge and corrupt intent with which he acted, rather than his defense that he was only trying to help the officers. Defendant cannot show prejudice, either, as he knew this information well before trial.

A.    Applicable Law

Constructive amendment occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." United States v. Vilar, 729 F.3d 62, 81 (2d Cir. 2013) (quoting United States v. D'Amelio, 683 F.3d 412, 416 (2d Cir. 2012)); United States v. Dove, 884 F.3d. 138, 146 (2d Cir. 2018) ("A constructive amendment occurs either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered.") (internal citations omitted).

44

"To prove a constructive amendment, a defendant must show that the evidence and jury instructions at trial completely shifted the core of criminality—i.e. proved 'behavior *entirely separate* from that identified in the indictment.'" United States v. Gross, No. 15-CR-769 (AJN), 2017 WL 4685111, at *23 (S.D.N.Y. Oct. 18, 2017), (citing United States v. Bastian, 770 F.3d 212, 223 (2d Cir. 2014)).  Because evidence at trial need not be a precise replica of the charges in an indictment, courts permit "significant flexibility" in the government's proof at trial, so long as the defendant was provided notice of the "'core of criminality' to be proven at trial."  See, e.g., United States v. Patino, 962 F.2d 263, 266 (2d Cir. 1992).  Furthermore, "[t]he core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."  D'Amelio, 683 F.3d at 418.  Accordingly, there is no constructive amendment where "a generally framed indictment encompasses the specific legal theory or evidence used at trial."  United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003).

B.      Discussion

Defendant's constructive amendment claim relies on the false premise that his lies to the officers are strictly separate from the concealment or destruction of Justin Nudelman's phone and its files.  That is untrue, and it falls far short of showing that the government "completely shifted the core of criminality" and proved "behavior entirely separate from that identified in the indictment."  Bastian, 770 F.3d at 223.  As detailed below, the lies to officers (1) fall squarely within the core of criminality, providing context for how officers eventually obtained the phone; (2) are another means of enabling the concealment and destruction of the phone and its files; and (3) bear directly on the wrongful intent needed to prove a conspiracy to obstruct justice.

Defendant cannot establish that lying to officers is "behavior entirely separate" from concealment of the phone and its files.  After all, the officers began speaking with Defendant so that they could find Justin and seize his phone pursuant to a warrant.  And Defendant's

45

interactions with the police explain why he accompanied them to the hospital where he then attempted to thwart officers' efforts to seize the phone by breaking and ultimately hiding Justin's phone in his pocket. These facts were plainly relevant to the concealment and destruction of the phone and its contents, "add[ing] context and dimension to the government's proof of the charges." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). While Defendant might have preferred to deprive the jury of that context, his preference must give way to the "need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997). Defendant's lies to officers did not shift the core of criminality; they were part of it.

Defendant's lies were not just context or background, either. They were another means of concealing the phone and enabling Justin to delete its contents. See, e.g., United States v. Stitsky, 536 F. App'x 98, 102–03 (2d Cir. 2013) ("The fraudulent acts described by these witnesses, although not specifically identified in the indictment . . . 'fall[] squarely within the charged scheme,' and thus their testimony did not constructively amend the conspiracy, wire fraud, and mail fraud counts." (quoting Salmonese, 352 F.3d at 621)). In summation and rebuttal, the government explained that Defendant lied to officers precisely so that Justin would have time to delete the phone's files, like the incriminating conversations between Justin and Defendant, the pictures of illegal guns sent to Defendant, and the videos of Defendant firing an MCD with Justin and Daddea. See, e.g., Trial Tr. 804 (arguing that Defendant "lied to police officers. He bought . . . time for his brother to delete the text messages that were filled with evidence of his own crimes. And when the opportunity arose to go further to hide Justin's phone that had those incriminating messages, he took it."); id. 816–817 (arguing in summation "Why lie over and over again to the detectives about his brother's location? Because he was in on it. He wanted to buy his brother

46

time to delete evidence of their crimes."). Bearing in mind that Justin deleted all of the files while he was on a two-hour call with Defendant, Defendant's lies to the officers were acts in furtherance of a conspiracy to conceal and/or destroy the phone's files.

Defendant also fails to consider that his lies to officers were probative of his mens rea, which is yet another reason that the evidence did not "completely shift the core of criminality." The object of the conspiracy, obstruction of justice, requires that a defendant act "corruptly." And as the Court instructed the jury, "[t]o act corruptly means . . . to engage in conduct knowingly and dishonestly and with the intent to obstruct, impede or influence the due administration of justice." Trial Tr. 975. Defendant's lies proved that he was engaging in conduct "dishonestly" and therefore "corruptly." And he told these lies knowing that officers were going to arrest and search Justin, reflecting his intent to impede the administration of justice. The government's arguments made that clear too. See, e.g., id. 842 (arguing that "smashing the phone was just the defendant's final corrupt act of the morning. His first lie occurred about four hours prior when he sent the detectives to the wrong hospital."); id. ("He purposefully sent them to the wrong hospital. He purposefully bought his brother time to delete evidence of his crimes. I submit that you also know that the defendant acted corruptly because he pretended to help the officers.").

Defendant does not substantially address the many reasons to conclude that the lies to officers were part of a continuing effort to hide and destroy the evidence on his brother's phone. Instead, he claims a "rational jury could well have convicted on the lying theory alone" because he considers the evidence of his lies "comparatively stronger" than the evidence that he broke Justin's phone. Mot. at 19. There are many problems with this argument. First, the Court's instructions and the government's arguments foreclosed any reasonable possibility that the jury could have convicted Defendant of obstructive acts entirely separate from the phone and the

47

evidence it held.   The Court instructed the jury that Count Three charged Defendant with conspiring to "corruptly alter, destroy, mutilate and conceal one or more records, documents and other objects, to wit, a cellular telephone and the files contained therein."  Trial Tr. 971; see id. at 973 ("The first element that the government must prove beyond a reasonable doubt is that the defendant altered or destroyed or mutilated or concealed any record, document or tangible object as alleged in the indictment. In this case, the indictment alleges that the defendant did so with respect to a phone.").  Similarly, the government explained that the obstructive conduct at issue was focused on the phone and its contents, as charged.  See id. 838 (arguing that "the defendant altered or destroyed or mutilated or concealed any record, document, or tangible object. Here, that's the cell phone.").  And the evidence on Justin's phone was an important part of the trial record.  The idea that the jury would ignore the Court's instructions, the government's arguments, and the source of much of the evidence against Defendant is patently unreasonable.

Defendant is not entitled to a second shot at trial simply by claiming the evidence of his lies was "comparatively stronger" than the evidence of his concealment or destruction of the phone, either.  Mot. at 19.  The jury decides what evidence is strong or weak — not Defendant. And Defendant cites no case establishing that body camera footage is necessarily stronger than witness testimony, physical evidence, or Defendant's own concessions.  There is plenty of reason to believe the jury viewed the evidence of Defendant's concealment or destruction of the phone as strong.  As noted above, Defendant hardly mentions the evidence that he tried to leave the hospital with Justin's phone in his pocket.  He does not dispute (1) that he took the phone from Justin in a secretive manner (Trial Tr. 764); (2) that he put the phone in his pocket rather than giving it to the officers, after he heard the officers present Justin with a warrant for his phone (id. 761); (3) that he took Justin's phone precisely when the officers left the room;  (4) that he told Justin to give him

48

the phone in a near-whisper, while raising his voice and pretending he wanted nothing to do with Justin right after taking the phone (id. 763–65); (5) that he tried to leave the hospital without telling the officers he had the phone (id. 766–67); or (6) that when officers asked him for the phone, his immediate reaction was to say "oh, security told you?" (id. 767).

And while Defendant emphasizes Mazur's note that he did not specifically see Defendant break the phone, the jury could readily infer that Defendant caused that damage for all the reasons detailed above in Section I.B.2. Ultimately, Defendant can only speculate that the jury convicted him based on his lies to officers alone, altogether apart from the broader evidence of his obstruction. Crediting those speculative assertions, rather than the jury's weight of a range of reliable, credible evidence, would be fundamentally at odds with Rule 33.

Defendant's final claim of prejudice is similarly baseless. According to him, the "defense prepared for a phone-destruction case, not a lying-to-police case," and he would have "devoted additional resources to challenging" the evidence of his lies. Mot. at 19. He has only himself to blame for manufacturing a false dichotomy between a "phone-destruction case" and a "lying-to-police-case." The government produced the body camera footage with his lies before trial, and Defendant knew the circumstances of his lies for years before that. The "lies to police" occurred on the same day, at the same time, that he and Justin worked to conceal and destroy the phone and its files. They are part of the same "core of criminality" charged in Count Three, not "an offense other than that charged in the indictment." Vilar, 729 F.3d at 81. Defendant's failure to appreciate the extent of his wrongdoing is not prejudice. There is no "real concern that an innocent person may have been convicted," and no new trial is warranted. James, 712 F.3d at 107.

IV.    There Was No Confrontation Clause Violation

Defendant next highlights a purported violation of the Confrontation Clause, claiming that he is entitled to a new trial because of testimony that Detective Uske left the hospital

49

room where Defendant and Justin Nudelman were and said "he fucking broke it [i.e., Justin's phone]." Mot. at 20. This argument fails for multiple reasons. Most obviously, the testimony was stricken from the record, and the jury was instructed not to consider stricken testimony. Jurors are presumed to follow such instructions, and such instructions are presumed to cure any Confrontation Clause violation. Detective Uske's statement was also an excited utterance rather a "testimonial" statement implicated by the Confrontation Clause in any event. Finally, any assumed error is harmless. This string of four words that was stricken from the record was not even close to the government's only proof that Defendant tried to break the phone or obstruct justice more broadly. It is no basis to set aside a well-reasoned verdict and redo a weeklong trial.

A.    Applicable Law

The Confrontation Clause generally bars the "admission of testimonial statements of a witness who did not appear at trial." Crawford v. Washington, 541 U.S. 36, 53–54 (2004). "[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial," i.e. to "establish or prove past events potentially relevant to later criminal prosecution." Ohio v. Clark, 576 U.S. 237, 244 (2015). "Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Michigan v. Bryant, 562 U.S. 344, 359 (2011).

Violations of the Confrontation Clause are subject to "harmless error" review. United States v. McClain, 377 F.3d 219, 221–22 (2d Cir. 2004). The Court must "evaluate[] whether the (assumed) error had substantial and injurious effect or influence in determining the jury's verdict." McBee v. Burge, 395 F. App'x 762, 763 (2d Cir. 2010). This analysis considers "many factors, including the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or

50

contradicting the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." Arroyo v. Lee, 831 F. Supp. 2d 750, 762 (S.D.N.Y. 2011) (internal citations and quotations omitted).

Where the Court strikes the testimony at issue and provides a corresponding instruction, that "is generally sufficient to eliminate any Confrontation Clause concern." United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009). And it is an "almost invariable assumption of the law that jurors follow their instructions." Richardson v. Marsh, 481 U.S. 200, 206 (1987); Zafiro, 506 U.S. at 540. "Absent evidence to the contrary, [courts] must presume that juries understand and abide by a district court's limiting instruction." United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002); United States v. Becker, 502 F.3d 122, 130 (2d Cir. 2007) ("Generally, we presume that juries follow limiting instructions" unless "there is an overwhelming probability that the jury will be unable to follow the court's instructions and the evidence is devastating to the defense.")

B.     Discussion

1.     Detective Uske's Statement Was Not Testimonial

Defendant's accusation that the government deliberately elicited testimonial hearsay is unfounded.[2] The evidence showed that Detective Uske made his statement in a fit of anger, almost immediately after Defendant handed him a broken phone that he had a warrant to seize, and following an encounter prompted by Mazur's observation that Defendant appeared to be leaving with the phone hidden in his pocket. See Trial Tr. 372–374, 760–767; GX 1501B. The

---

[2] Defendant claims that the government "deliberately elicited" testimonial hearsay, but he never explains how this factors into Confrontation Clause analysis. Regardless, the government certainly did not seek to violate the Constitution. The government simply asked Detective Molinaro "After Detective Uske, approached you, what happened?" Trial Tr. 378. And while Defendant claims the government "compounded the harm" on redirect, the statement never came up again. The government just asked about personal observations of Detective Uske's demeanor, which the Court had previously, correctly noted was still admissible. Trial Tr. 398.

51

statement was an excited utterance "made under the stress of excitement" arising from a "startling event": the realization that Defendant tried to destroy a source of evidence that he knew officers were authorized to seize. Fed. R. Evid. 803(2). "An excited utterance is a firmly rooted hearsay exception and therefore carries sufficient indicia of reliability to inevitably satisfy the Confrontation Clause." Mungo v. Duncan, 277 F. Supp. 2d 176, 184 (E.D.N.Y. 2003); United States v. Tocco, 135 F.3d 116, 128 (2d Cir. 1998) ("An excited utterance is [a] firmly established exception [to the hearsay rule] that escapes independent Confrontation Clause analysis."); White v. Illinois, 502 U.S. 346, 356 (1992).[3]

Because excited utterances are unfabricated reactions to startling events, their primary purpose is not "to create an out-of-court substitute for trial testimony." Clark, 576 U.S. at 246. The circumstances of the encounter firmly establish that Detective Uske was not fashioning a substitute for testimony years before Defendant was charged. See Bryant, 562 U.S. at 370 (noting courts must "objectively evaluat[e] the statements and actions of the parties to the encounter, in light of the circumstances in which the [statement] occurs"). This was an informal statement from one detective to another, venting frustration at realizing just moments earlier that he may have lost a fruitful source of evidence of a broader gun trafficking conspiracy. See Clark, 576 U.S. at 245 (explaining the "informality of the situation" is "less likely to reflect a primary purpose aimed at obtaining testimonial evidence"). That sets this case far apart from the only case cited by Defendant, which addressed "crime scene evidence (including reports, diagrams, and photographs)" prepared by a dedicated Crime Scene Unit detective. See Diaz v. Miller, No. 22-1835, 2023 WL 4363245, at *1 (2d Cir. July 6, 2023); Mot. at 21 (citing Diaz).

---

[3] Indeed, the Court acknowledged that the statement "could be an excited utterance," but ultimately determined that striking the statement was the better course. Trial Tr. 398.

52

While Detective Uske's statement had probative value at trial, that says nothing about his purpose in uttering the statement over two years earlier. See Yusuf v. Colvin, No. 18-CV-3360 (MKB), 2022 WL 4291784, at *16 (E.D.N.Y. Sept. 16, 2022) ("An out-of-court statement does not acquire a testimonial character merely because the statement will be useful in a later criminal prosecution."). Detective Uske's statement was an excited utterance rather than a testimonial accusation, and it would have been entirely appropriate to admit the statement and allow the jury to consider it. There is no Confrontation Clause violation.

2.       Any Assumed Violation Was Cured

Regardless, any hypothetical violation is moot. The Court struck the purportedly offending statement and instructed the jury that stricken testimony was not evidence. Trial Tr. 934. The jury did not have the statement before it during deliberations, and instructions like the Court's are presumed to cure even a clear Confrontation Clause violation. United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006) ("[As] the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions."); Jass, 569 F.3d at 55 (an appropriate instruction "is generally sufficient to eliminate any Confrontation Clause concern").

There is nothing to suggest the instructions were ineffective here. Instead, Defendant proffers three threadbare arguments that lack a basis in law or fact. First, he repeats his claim that the government "deliberately elicited" testimonial hearsay, without citing any law to explain how that affects a juror's ability to follow clear instructions. Mot. at 22. Besides being legally baseless, the argument is factually baseless. As noted above, the statement was an excited utterance, and the government did not reintroduce it when the Court struck it.

Second, Defendant claims the government "used Uske's demeanor as a backdoor to communicate the substance of the struck statement." Id. Yet again, Defendant cites no law to

53

support the counterintuitive proposition that personal observations of another's "demeanor" amount to a testimonial statement. On the contrary, the "Confrontation Clause targets only that testimony that contains accusations against the defendant." Ryan v. Miller, 303 F.3d 231, 247 (2d Cir. 2002). Excitement and stress are not accusations, and this is no basis to haul in a new jury.

Third, Defendant's last argument is that "the jury heard the statement before it was struck." Mot. at 21. That is true for any testimony curatively stricken from the record. Defendant claims the statement would nonetheless "lodge[] in a juror's memory" because it is "vivid, profane, and accusatory." Id. But testimonial statements are by definition "accusatory," and the only case he cites — Bruton — does not even arguably stand for the proposition that jurors cannot disregard statements that are "vivid" or "profane." Bruton recognized a "narrow exception" to the "almost invariable assumption of the law that jurors follow their instructions" where "the facially incriminating confession of a non-testifying codefendant is introduced at [a] joint trial." Richardson, 481 U.S. at 206–07. Bruton's facts are a world apart from the facts here. Defendant cannot explain how a statement undermines the "almost invariable assumption of the law that jurors follow their instructions" just because it is "profane" or "vivid" —let alone the relevant statement here: four words spoken in a matter of seconds amongst a weekslong trial. Even assuming a Confrontation Clause violation, the Court cured it by striking the statement and instructing the jury to disregard it.

### 3. The Error was Harmless Beyond a Reasonable Doubt

Finally, any error in admitting the (actually stricken) statement was harmless. Defendant's argument to the contrary is unpersuasive, amounting essentially to his claim that Detective Uske's statement was "the single most direct piece of evidence that [Defendant] broke Justin's phone." Mot. at 23. The Court should flatly reject this argument.

54

Defendant's reductive claim yet again ignores the broader proof of obstruction. As already noted above in Sections I.B.2. and III., the government's case did not depend upon proving Defendant broke the phone. The jury could easily and appropriately conclude that Defendant conspired to obstruct justice based on the largely undisputed evidence that he concealed the phone. None of that evidence depended upon Uske's statement about the phone being broken, and Defendant's failure to even acknowledge the evidence is telling. He has no answer for it, and it demonstrates his guilt beyond a reasonable doubt. See, e.g., United States v. McCallum, 584 F.3d 471, 478 (2d Cir. 2009) ("We have repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless."); cf. Perkins, 596 F.3d at 178 ("[The Petitioner] introduced no testimony or evidence directly contradicting [the testimony at issue], which also weighs in favor of finding harmless error.").

Defendant's arguments are also internally inconsistent. While the Confrontation Clause argument implies the jury's verdict turned on the notion that Defendant broke the phone, the constructive amendment argument claimed that the jury might have convicted him solely of lying to the police. Defendant does not get to pick and choose which evidence the jury relied upon when it suits his argument. See Archer, 977 F.3d at 189 ("[A] district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis."). As detailed above, evidence of his lies to the police strongly supported the inference that he acted with a corrupt intent when he tried to conceal or destroy evidence at the hospital. That diminishes the impact of the stricken statement even further. See McClain, 377 F.3d at 222–23.

Finally, Detective Uske's stricken statement about the phone was far from the only evidence that Defendant broke the phone. The jury had the phone itself, which was so significantly damaged that it speaks to the intentional effort to destroy it on its own. GX 700. The jury also

55

had ample evidence that Defendant was far more likely to have broken the phone than Justin Nudelman.  Detective Molinaro testified that the phone did not work when he received it, and the evidence showed that Justin could use it as recently as an hour and a half before officers reached the hospital.  Trial Tr. 379; GX 1301H.  And the jury saw video evidence showing Justin was bedridden, with both legs raised and one arm in a cast.  Trial Tr. 373; GX 1501B.  The notion that Justin could damage the phone that severely with just one hand is hard to credit, and it is surely no basis for a new trial.  And the jury could readily credit Mazur's testimony that he heard the sound of cracking glass almost immediately after Defendant took Justin's phone, entirely independent of the stricken statement.  At the end of the day, Detective Uske's stricken statement was cumulative and corroborated.  See, e.g., Diaz v. Miller, No. 22-1835, 2023 WL 4363245, at *2 (2d Cir. July 6, 2023) (finding error harmless where the evidence "could reasonably be considered cumulative of other properly admitted, corroborating evidence").

There was no Confrontation Clause violation, any assumed error was cured, and any assumed cured error was harmless beyond a reasonable doubt.  Defendant's motion is baseless.

V.    The Admission of Government Exhibit 100BL Was Not Error and Does Not Warrant a New Trial

Defendant next claims that a new trial is warranted because the Court allegedly improperly admitted a single text message from a single exhibit during the weeklong trial:  Justin Nudelman's question "why did you leave that vape on the front of my bed. They took it an[d] was like you're not supposed to have this."  Mot. at 24 (quoting GX 100BL).  This argument borders on absurd.  Courts have wide latitude with respect to evidentiary rulings, and the Court did not abuse its discretion in admitting this exhibit.  On the contrary, the Court properly did so.  The statement was not offered for a hearsay purpose; whether Defendant left a vape on Justin's bed is irrelevant.  Instead, that Justin sent Defendant this text message mere days before September 7

56

bore on Defendant's state of mind when he lied to officers about his knowledge of Justin's location. The statement is also in furtherance of the conspiracy, as it served to foster and maintain cohesiveness between the coconspirators as they continued to commit crimes together. And even if the statement was hearsay, any error in admitting it would plainly be harmless. The jury's determination that Defendant and Justin conspired to obstruct justice by concealing and destroying evidence of gun trafficking did not rely on this statement alone.

A.      Applicable Law

1.      Standard of Review

Evidentiary rulings are reviewed "deferentially" for "abuse of discretion." United States v. Dupree, 706 F. 3d 131, 135 (2d Cir. 2013). Under this standard, a ruling should only be disturbed if the decision to admit or exclude evidence was "manifestly erroneous." United States v. Litvak, 889 F.3d 56, 67 (2d Cir. 2018). That is because a district court "is empowered to make a decision – of *its* choosing – that falls within a range of permissible decisions." Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir. 2001). A court abuses or exceeds that discretion only when: "(1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." Id.; United States v. Atilla, 966 F.3d 118, 131 (2d Cir. 2020) (explaining that an abuse of discretion will only be found if the trial judge "ruled in an arbitrary and irrational fashion").

Even assuming abuse of discretion, the Court should "disregard errors in admitting or excluding evidence if the errors are harmless." Atilla, 966 F.3d at 131. A "defendant has a right to a fair trial, but not necessarily to a perfect one, and an error does not warrant reversal if it is harmless." Rea, 958 F.2d at 1219–20. An erroneous ruling on the admissibility of evidence is

57

harmless if that evidence did not "substantially influence the jury." Id. at 1220.  There are four factors relevant to harmless error review:  "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." United States v. Garcia, 413 F.3d 201, 217 (2d Cir. 2005).

2.      Hearsay

"The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement." United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013).  However, "statements not offered for their truth, but instead for their effect on the listener or for context, may be introduced as non-hearsay statements." United States v. Bouterse, 765 F. App'x 463, 468 (2d Cir. 2019).  "More specifically, evidence introduced to prove the listener's knowledge, or to show that a listener was put on notice, is not hearsay." United States v. Watson, No. 23-CR-82 (EK), 2024 WL 4455773, at *2 (E.D.N.Y. May 31, 2024) (citing Dupree, 706 F.3d at 137) (internal quotations omitted).

Additionally, a statement is not hearsay if "[t]he statement is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).  To admit a statement pursuant to the coconspirator exception, the Court "must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).  "[T]he standard for what qualifies as a statement 'in furtherance' of a conspiracy is not very restrictive." United States v. Malka, 602 F. Supp. 3d 510, 533 (S.D.N.Y. 2022).  The statement can be one that provides reassurance or serves "to foster trust and

58

cohesiveness." United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001); United States v. Maldonado-Rivera, 922 F.2d 934, 958–59 (2d Cir. 1990).

B.    Discussion

1.    Exhibit 100BL Is Not Hearsay, and the Court Properly Admitted It

Defendant claims the Court erred in admitting Exhibit 100BL because it is "classic hearsay." Mot. at 24–25. He argues that the statement was admitted "to prove that [he] left a vape at Justin's hospital bed," which did not "advance the conspiracy's objectives" or "communicate information necessary for the conspiracy's success." Id. He is wrong on both counts.

First, the government did not offer Exhibit 100BL for the truth of the assertion made therein. Whether Defendant left a vape on Justin Nudelman's bed, and whether the nurses confiscated that vape, is beside the point. The government offered this statement for a different purpose: Defendant's state of mind when he discussed Justin's whereabouts with officers. Justin's repeated text messages from his hospital bed, and Defendant's responses to those messages (such as ordering food to be delivered to that hospital bed), all went to Defendant's knowledge that Justin was staying at RUMC rather than SIU North. See Trial Tr. 362–68. It is well established that where a statement is offered not for its truth, but for the fact that its receipt bears on a defendant's state of mind, the statement is properly admitted. See, e.g., United States v. Moseley, 980 F.3d 9, 27 (2d Cir. 2020) (affirming introduction of third-party complaints, regardless of truth, "to show the defendant's culpable state of mind" and "intent to violate the law"). Whether Defendant put a vape on Justin's bed or not, this message fit into a broader pattern of communications while Justin was at RUMC. That pattern of messages raised the reasonable inference that Defendant knew Justin was at RUMC, which was therefore probative of his intent to obstruct justice when he told officers that Justin was at SIU North instead. Admission of the text message for this non-hearsay

59

purpose was appropriate.  See, e.g., McGuire v. Vill. of Hempstead, No. 20-CV-02117 (JMW), 2025 WL 2880086, at *2 (E.D.N.Y. Oct. 9, 2025) (noting evidence is not hearsay "when offered for a reason other than proving the matter is true, such as demonstrating notice").

Second, the statement in Exhibit 100BL was a coconspirator statement.  As the Cout correctly concluded, and the jury's verdict establishes, there was ample evidence that Defendant and Justin Nudelman conspired to traffic firearms.  See Trial Tr. 788–792 (Court ruling 801(d)(2)(E) statements admissible); 993–994 (jury verdict).  The statement in Exhibit 100BL also falls comfortably within the broad scope of statements in furtherance of a conspiracy.  The conspiracy was ongoing when Justin sent that text message on September 1.  See United States v. Katz, 601 F.2d 66, 68 (2d Cir. 1979) (explaining that a conspiracy is presumed to continue until the last overt act by any of the conspirators).  In the days that followed, Justin continued to message coconspirators like Ronnie Mershon about selling firearms and store firearms, 3D printers, ammunition, and related components at his home.  Trial Tr. 316.  And the statement served to maintain the trust and cohesiveness between Defendant and Justin.  Both Defendants had a vested interest in concealing their illegal drug and gun dealing, even with Justin bedridden at RUMC, and helping conceal Justin's drug use from his hospital bed is a show of trust and commitment to disregarding the rules.  Justin was also deeply dependent on Defendant's assistance following his injury, for tasks such as removing or selling guns and drugs from his home.  See, e.g. Trial Tr. 179–82 (Mershon testifying about removing a gun and drugs from Justin's home with Defendant).  The jury could reasonably infer that Justin's requests for assistance helped preserve and prolong the illicit dealings, and the Court properly admitted the statement for its consideration.  See, e.g., United States v. Torres, 435 F. Supp. 3d 526, 532 (S.D.N.Y. 2020), aff'd, 124 F.4th 84 (2d Cir.

60

2024) (discussing how statements that "seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness" are generally found to be in furtherance of the conspiracy).

  2.  <u>Any Arguable Error Was Harmless</u>

  Even assuming <u>arguendo</u> that Exhibit 100BL fell beyond the Court's wide latitude to admit, that hypothetical error was harmless. Consideration of the four factors set forth in <u>Garcia</u> makes clear that this single text message in a single exhibit did not have any "substantial effect on the jury verdict of guilty." <u>Garcia</u>, 413 F.3d at 219.

  <u>First</u>, Exhibit 100BL was not noteworthy in light of the "overall strength of the prosecution's case." As detailed above, the government's evidence on the obstruction conspiracy was far more extensive than a text message. The jury considered evidence that (1) Justin Nudelman deleted text messages with Defendant the morning officers moved to seize his phone; (2) phone records showing the deletions occurred while he was on the phone with Defendant, starting shortly after the officers searched Justin's home and ending shortly after officers told Justin they were with Defendant; (3) Defendant's pervasive lies about how often he interacted with Justin as well as Justin's whereabouts; (4) the damaged phone that still contained the deleted evidence in its memory; (5) the undisputed fact that Defendant tried to leave RUMC with that phone hidden in his pocket; and (6) a combination of testimony from Mazur and Molinaro that demonstrated Defendant tried to break and hide the phone from officers. "[G]iven the strength of this evidence, it is highly unlikely that [the disputed evidence] influenced the jury's verdict." <u>United States v. Mussaleen</u>, 35 F.3d 692, 695 (2d Cir. 1994).

  <u>Second</u>, "the prosecutor's conduct with respect to the improperly admitted evidence" confirms that any impact on the verdict would be limited. <u>See</u> <u>Rea</u>, 958 F.2d at 1220 ("To say that the erroneously admitted testimony did not substantially influence the jury we are

not required to conclude that it could not have had any effect whatever.") (internal citations and quotations omitted).  While Defendant argues the government "exacerbated the injurious effect" of this supposedly "toxic" hearsay by relying on it, the record disproves that.  Mot. at 26.[4]  Exhibit 100BL came up only two or three times over the course of trial.  The testimony about the exhibit amounted to two questions and two answers, including reading the text into the record.  Trial Tr. 583–84.  Apart from that, Exhibit 100BL was mentioned in a single sentence in rebuttal, couched by an extensive discussion of the other evidence of obstruction, in response to Defendant's claim that he honestly mistook which hospital Justin was at.  Id. 911–913.  This minimal reliance heavily counsels in favor of finding any purported error harmless.  See, e.g., McBee, 395 F. App'x at 764 (having "no trouble concluding that the (assumed) error is harmless" where prosecutor's "references were brief, especially relative to the emphasis on other important evidence"); Gutierrez v. McGinnis, 389 F.3d 300, 309 (2d Cir. 2004) (finding harmless error where prosecutor highlighted the evidence at issue as just one of several pieces of evidence during summation).

Third, Exhibit 100BL was not particularly important to the government's proof on Count Three.  As detailed above, the government's obstruction case did not depend upon lying to police.  The lies about Justin's location simply provided context for his later efforts to conceal and destroy evidence of his crimes and supported the inference that he acted corruptly when doing so. Excising this text message from the record would do nothing to shield the jury from the broken phone, the deleted text messages, and corroborated, undisputed witness testimony that Defendant took Justin's phone when no officer was looking and tried to leave with it hidden in his pocket.

---

[4] Exhibit 100BL is not "toxic," unlike the statements in the only case Defendant cites.  See Mot. at 26.  The statement in United States v. Cummings was an alleged death threat by the defendant, offered against him in a murder case without any limiting instruction.  See 858 F.3d 763, 774–75 (2d Cir. 2017).  Justin Nudelman's complaint that a nurse took his vape is not remotely comparable.

Fourth, Exhibit 100BL was "cumulative of other properly admitted evidence." There was a host of other evidence showing Defendant knew Justin was at RUMC when he lied to officers. See GX 100BE, 100BE-001, 100BF, 100BF-008; Trial Tr. 580–83. The government highlighted this evidence in rebuttal as well, further minimizing any impact Exhibit 100BL may have had on the jury's deliberations. Trial Tr. 912. Even assuming Exhibit 100BL was erroneously admitted, it was simply "cumulative of the properly admitted evidence." Perkins v. Herbert, 596 F.3d 161, 177–78 (2d Cir. 2010). "[A]ll four factors support the conclusion that the [disputed evidence] was harmless," and no new trial is warranted. Garcia, 413 F.3d at 217.

## VI.   The Government Appropriately Argued Reasonable Inferences from the Evidence in Summation and Rebuttal

Defendant's last argument in support of his request for a new trial is purported misconduct in summation. First, he claims the government improperly "constructed a narrative of profit and greed that was unsupported by the trial evidence." Mot. at 27. Second, he argues that the government inappropriately "inflame[d] the jury's fear and anger" by telling the jury that he "knowingly put dangerous weapons into the hands of dangerous people . . . without any evidentiary basis as to [his] knowledge or intent regarding the end users of the firearms." Id. at 29. Defendant concedes that he did not object to any of these arguments, but he claims that he clears the high bar for plain error review because the government's financial argument "was not merely unsupported but affirmatively contradicted by the trial evidence," and its customer base argument "attributed to [Defendant] a video he never saw depicting a person he never met." Id. at 31.

This argument is also groundless. The government's arguments were firmly rooted in the record and the reasonable inferences that could be drawn from it. From the beginning of trial to this motion, Defendant has repeatedly acknowledged that Justin Nudelman only made money through selling guns and drugs. He conceded that he expected Justin to pay him back the

63

money he owed, and he now concedes that he knew Justin was illegally manufacturing guns. That raises a natural inference: Defendant expected Justin to pay him back with money earned by selling guns and drugs. And the record established that (1) Defendant, Justin, and Mershon used ghost guns because their felony convictions barred them from legally purchasing guns; (2) that the conspirators' target audience was other individuals who could not or would not buy guns legally; (3) that Defendant and his conspirators agreed upon prices that were double or triple those charged by licensed dealers; (4) that Defendant favored manufacturing guns that were easily concealed; and (5) that the conspirators transferred guns to prohibited purchasers like the individual with an ankle monitor in GX 709. That record supported a reasonable inference that Defendant knew the ghost guns he helped manufacture would end up in the hands of people who should not have them. Given the wide latitude afforded in summation and rebuttal, the statements did not amount to misconduct, let alone misconduct severe enough to warrant the extraordinary remedy of a new trial. See United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998) ("The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence").

A.     Applicable Law

A defendant seeking a new trial based on "a prosecutor's remarks . . . faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." Coplan, 703 F.3d at 86 (2d Cir. 2012) (citation and quotation marks omitted). Even improper statements do not warrant reversal unless they cause "substantial prejudice" in that they "so infect the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Shareef, 190 F.3d 71, 78 (2d Cir. 1999) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)); United States v. Banki, 685 F.3d 99, 120 (2d Cir. 2011) ("When a remark is found to be improper in summation, it still 'must cause substantial prejudice

64

to result in a new trial.'"").  Accordingly, a conviction "is not to be lightly overturned on the basis of a prosecutor's comments standing alone in an otherwise fair proceeding." Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (quoting United States v. Young, 470 U.S. 1, 11 (1985)).

When evaluating claims about summation, the court must evaluate substantial prejudice "in the context of the entire trial." United States v. Thomas, 377 F.3d 232, 244 (2d Cir. 2004) (internal quotation marks omitted); United States v. Espinal, 981 F.2d 664, 666 (2d Cir.1992).  To determine if a defendant suffered substantial prejudice, the court must consider (1) the severity of the misconduct; (2) measures taken to cure the misconduct; and (3) the certainty of conviction absent the misconduct. United States v. Banki, 733 F. Supp. 2d at 411 (E.D.N.Y. Jul. 30, 2010) (citing United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002)).  Even in a case with serious misconduct, "proper instructions by the trial court may suffice to prevent undue prejudice and make the misconduct harmless." United States v. Walker, 835 F.2d 983, 988 (2d Cir. 1987).

B.    Discussion

1.    Inferences of Greed and Profit

According to Defendant, the government's arguments that he had a profit motive were based on facts not in evidence.  For example, he claims the government could not argue that he expected to receive money back from Justin Nudelman because allegedly, "no witness testified that [he] expected, or received, a 'cutback' from the firearms trafficking conspiracy."  Mot. at 27–28.  He similarly claims the government erred by "directly attribute[ing] the $700 sale price" for illegal guns to him personally, because there was purportedly "no evidence that [he] received $700 or any other amount from any gun sale."  Id. at 27.  Finally, he claims the government could not reference in rebuttal the Lamborghini where he concealed a firearm because "the Lamborghini served as visual shorthand for wealth derived from criminal activity" and the government did not prove "the Lamborghini was purchased with proceeds from firearms trafficking."  Id. at 28.  These

65

claims mistake the government's arguments, misstate the trial evidence, and misunderstand well-settled law allowing the government to argue reasonable inferences from the evidence.

The government's arguments about Defendant's financial expectations were anchored in the trial record and the reasonable inferences arising from it. There is no dispute that Defendant wanted Justin to pay him back for the money he lent; defense counsel conceded it in closing. See Trial Tr. 864 (counsel arguing "[Defendant] and Justin would fight about money, about Justin owing Brandon money and not paying it back."). That concession was sensible, as it was based on testimony and text messages between Defendant and Justin. Defendant and Justin regularly texted about how much money Justin owed Defendant, undercutting any suggestion that Defendant was freely giving Justin an allowance with no expectation of repayment. Id. 546–52, 554–55, 560, 565–66, 570. Mershon confirmed as much, as he testified that when Defendant and Justin fought, Defendant told Justin to pay him back hundreds or thousands of dollars at a time. Id. 83–84, 307. Similarly, the record undisputedly established that Justin only made money by selling guns and drugs. Defendant made that point in opening arguments, in closing arguments, and again in the instant motion. Id. 23–24 (arguing in opening that "Justin was chronically unemployed, and he made money where he could by selling guns and drugs"); 862 (saying he was "chronically unemployed" and "running a cash business" in closing); Mot. at 1 ("Justin Nudelman[] was unemployed [and] intermittently made money selling guns and drugs").

The government simply argued the natural inference that followed from these undisputed facts: if Defendant expected Justin Nudelman to pay back the money he owed, and Justin only made money by selling guns and drugs, then Defendant expected Justin to pay him back with money earned by illegally selling guns and drugs:

> When the defendant and Justin fought, it was about money. The defendant consistently told Justin he needed to pay him back just

66

> like in this text message, in the thousands. And as you learned at trial, Justin didn't have a job.  So, ask yourself, [as] a matter of common sense, how is Justin supposed to pay the defendant back?  Through selling guns and selling drugs. . . . You heard it from the defendant's lawyer [herself] back in the opening statements. She said, and I quote, "Justin was chronically unemployed, and he made money where he could by selling guns and selling drugs."  So let's be real.  There is no dispute that the only way that Justin made his own money was by selling guns and selling drugs. The defendant knowingly gave Justin money for guns and drugs with the expectation that he would get a cut back.

Trial Tr. 909.  The "cut back" phrasing that Defendant so indignantly criticizes now follows not only from the record, but his own concessions.  The argument was entirely appropriate.  See, e.g., United States v. Roldan-Zapata, 916 F.2d 795, 807 (2d Cir. 1990) (the government is "free to make arguments which may reasonably be inferred from the evidence presented.").

And as detailed elsewhere in this brief, the arguments were rooted in a range of supporting evidence.  For example, the government pointed out that contrary to Defendant's suggestion that he simply provided Justin Nudelman with money, Defendant received money from coconspirators like Mershon and Daddea.  And while Defendant claimed that he made these transfers because Justin was running a "cash business," the government permissibly responded by pointing out this "cash business" was the illegal, untraceable sale of guns and drugs, which bore directly on Defendant's knowing, willful participation in the charged conspiracy:

> Notice how in the closing, defense counsel just said, "Justin had a cash business, and that's why the defendant needed to make all those financial transfers for him"?  Remind yourself what that cash business was: Selling guns and selling drugs. And, remember what Ronnie Mershon told you about why those were cash businesses, because they are illegal sales that they did not want anyone to be able to trace.  When the defendant was making all these financial transfers, he wasn't just looking out for a brother as a brother. He was helping Justin conceal an illegal cash business for guns and drugs. And that's how you know he was a part of this business.

Trial Tr. 909–10.

Defendant's claim that the government could not reference the typical $700 sales price in summation is similarly baseless. The government did not reference that figure to claim Defendant personally received $700 from a discrete sale. It referenced that figure because it demonstrated the detailed conversations Defendant, Justin, and Mershon had about selling guns, and because the defendant assisted with sales more generally. The arguments flowed directly from that evidence. See, e.g. id. 804 ("without the defendant, this illegal enterprise could not have happened. He financed it. He advised them on what to sell and how much to sell it for. He provided customers."); id. 813–14 ("[T]he defendant advised them about pricing, gave his input, and gave his idea that smaller firearms would be better as they are more concealable. He also helped with the marketing and sale of the guns."); id. 899 ("[T]his isn't just a case about how the defendant just gave his little brother money. He gave advice on what to sell and how to sell it."). The government did not misstate the evidence; it used the $700 price point as a rhetorical representation of the conspirators' profit motivation more generally.

Defendant's claim about his Lamborghini is also easily dispensed with. At trial, Mershon testified that he had seen Defendant conceal a ghost gun in his Lamborghini. Trial Tr. 70–72. Because coconspirator Michael Daddea's Instagram account had a video of Defendant meeting Daddea in that same Lamborghini, the government introduced the video and asked Mershon to show the jury where Defendant hid the firearm. Id. 72–74. The Court properly overruled Defendant's objection to the introduction of this evidence, as Defendant's concealment of guns, and his advice to focus on manufacturing small, easily concealed guns, went directly to the willfulness with which he aided and conspired to traffic firearms. See United States v. Shan, 361 F. App'x 182, 183 (2d Cir. 2010) ("[T]he government showed that Shan acted willfully by

68

presenting evidence that he was wary to let others witness his transactions and that he sold weapons for above market price.").  The government did not argue in rebuttal that Defendant bought the Lamborghini with illicit proceeds.  It referenced the car only once, in passing, as an example of a place where Defendant hid guns that he was not allowed to have.  See Trial Tr. 918 ("Remember how the whole conspiracy started.  The defendant, Justin Nudelman, and Ronnie Mershon all had prior felony convictions, and as the Court will tell you, convicted felons cannot have guns.  But you've seen the defendant on video multiple times possessing guns anyway. You have him on video breaking the law already.  And remember what guns he liked: The small concealable Glock 43 that you can fit in your pocket or that you can hide in places like his Lamborghini's secret compartment").  That was consistent with the testimony that the Court correctly admitted, and it was fair for the government to remind the jury of that evidence in rebuttal.

> 2.      Inferences Regarding the Conspirators' Clientele

Defendant next argues that the government engaged in misconduct by pointing out that the conspiracy contemplated selling firearms to prohibited persons.  While admitting that Mershon testified the "general customer base for the conspiracy's guns" was "people who could not buy firearms legally or who intended to use them" improperly, he claims the government could not argue that Defendant knew this because Mershon purportedly "never testified that [Defendant] shared this understanding, discussed the end users, or expressed indifference to how the gun would be used."  Mot. at 29.  He also argues that the government could not suggest that the individual depicted in Exhibit 709 was representative of the "customer base" because his ankle monitor, a "visible marker of criminal justice involvement," was "calculated to frighten the jury" and the government did not prove he specifically knew that individual.  Id. at 29–30.  Finally, he claims

69

that telling the jury to hold Defendant responsible for "putting your lives and the lives of your neighbors at risk" was a "transparent appeal to the jury's fear." Id. at 29.

None of these arguments warrant a new trial. First, Defendant was convicted of conspiring to traffic firearms with Mershon and Justin Nudelman. And as Mershon testified, the scheme originated in significant part because Defendant, Mershon, and Justin were prohibited purchasers themselves. That is what the government pointed out. See, e.g., Trial Tr. 805–06 (arguing that "[t]his began because the defendant and his co-conspirators saw a marketplace. They saw customers. The defendant saw people like himself, people who are unable to legally own firearms because of a prior felony conviction."). And as noted above, Defendant explicitly discussed setting the price for the illegal guns between $700 to $1,000. The conspirators chose that elevated price point, which was double or triple the price of guns from legitimate dealers, because they targeted a segment of purchasers who could not or would not buy guns legally. Again, the arguments followed precisely from this evidence. See id. 48, 60–61, 306, 806 ("The defendant, Justin Nudelman, Michael Daddea, and Ronnie Mershon saw this group of people, people who could not have firearms, as their target customers. People who, as Ronnie Mershon explained, would pay prices that were doubled, nearly tripled, compared to the price of a gun store for homemade, 3D-printed unlicensed and unregistered firearms for the precise reason that they could not obtain them otherwise."); id. 918 ("The defendant and his co-conspirators made these guns with the express plan to sell them to other people who could not buy guns legally or who wanted their guns to be untraceable. And that's the only reason that they were charging more than double or triple what you'd pay in a normal gun store. Ask yourself, who would choose to go to these guys instead of an established manufacturer? People who can't pass a background check. People who cannot or should not have guns."). The record also contained evidence permitting an

70

inference that Defendant knew the sales were illegal.  Id. 43, 47–48, 162–163, 303–305, 899 (noting testimony that Defendant brought "trusted buyers, who the co-conspirators can bargain with, all without blowing their cover.  Remember what Mershon testified. A lot of times they would have the guns covered on the pool table and they'd only uncover it when the defendant told them, the people he brought, these guys are cool.")

Defendant also ignores evidence that tied him to another dangerous individual.  As Mershon testified, and text messages corroborated, Defendant brokered the sale of a firearm to an associate named Bobby, who had threatened Justin with a gun because of an unpaid debt.  Id. 162–68; GX 300S at 5.  As the government reasonably argued, evidence about purchasers like Bobby undercut Defendant's claim that he was innocently helping Justin.  See id. 907 ("counsel told you that when the defendant gave Justin money, that was just the simple human act of a brother helping a brother . . . That was not what was happening here. When the defendant sold that Glock 43 to Bobby, the guy who pulled a gun on Justin because he owed him money, that was not just a brother helping a brother.").  The argument that Defendant supplied guns to dangerous individuals was a reasonable inference from the record, not a fabrication.  Viewed in context, the government's claim about "put[ting] guns into the hands of people who should not have them" was a commonsense interpretation of "evidence that [Defendant] conspired to traffic firearms, that he manufactured and dealt firearms, [and] that he helped others manufacture and deal firearms."  Id. 803.

The government did not, and did not need to, claim that Defendant specifically sold a gun to the individual depicted in Exhibit 709, either.  As Defendant concedes, the ankle monitor that that individual wore was a "visible marker of criminal justice involvement," and therefore evidence corroborating the arguments about Defendant and his coconspirator's purchasers.  This individual was simply a representative example of the conspirators' target audience.  Regardless,

71

Defendant's claim that he did not know the individual, and never dealt with him, also assumes facts not in evidence.  As the government permissibly noted, the gun that the individual in Exhibit 709 fired appears to be one of the three guns that Defendant told Justin his contact would buy.  See GX 709 (firing a blue 3D-printed handgun with a black slide on June 18, 2023), 100AC (Justin sending Defendant a picture of three 3D-printed handguns, two of which are blue with black slides, with Defendant replying "he said he wants to buy one" on June 10, 2023); Trial Tr. 904 ("Mershon told you their target market was other people who couldn't get guns legally. That was corroborated too. Remember Exhibit 709, the video of a guy with an ankle monitor shooting one of the guns that they made – one of those same three guns that the defendant advertised for sale").  Whether Defendant specifically sold one of those three guns to the individual with the ankle monitor or not, he was plainly involved in the conspirators' shared efforts to sell it.

It was not improper to note the simple fact that guns are dangerous, and that the law prohibits dangerous people from having guns, either.  See United States v. Rivera, 971 F.2d 876, 884 (2d Cir. 1992) ("A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation."); United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995).  Since Defendant framed his criminal conduct as "the simple, human act of a brother helping his struggling younger sibling," it was proper to remind the jury what this purportedly "simple, human act" entailed.  Trial Tr. 848.  The government's argument was directly responsive to Defendant's baseless claim that the government "spent this trial trying to make [the jury] forget the difference between being a brother and being a criminal."  Id. 894; United States v. Bagaric, 706 F.2d 42, 60 (2d Cir. 1983) ("This court has repeatedly held that the Government is ordinarily permitted to respond to arguments impugning the integrity of its case, and to 'reply with rebutting language suitable to the occasion.'").

72

Finally, there is no basis to set aside Defendant's conviction simply because of a passing remark about the safety of jurors or the community. Disturbing a conviction based on remarks in summation is a "drastic remedy," warranted only where the challenged remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Wainwright, 477 U.S. at 181. The remark is highly unlikely to have influenced the jury's verdict, as it was made in passing among a tidal wave of other perfectly permissible arguments within a summation that lasted over an hour in total. See Trial Tr. 843–44 ("We are asking you today to hold the defendant responsible: To hold him responsible for conspiring to manufacture and deal firearms; to hold him responsible for manufacturing and dealing firearms; to hold him responsible for conspiring to obstruct justice; to hold him responsible for putting your lives and the lives of your neighbors at risk; to hold him responsible for some dangerous, unregistered, unlicensed firearms; to hold him responsible for putting dangerous weapons out on the street while putting money in their own pockets."). In this context, the notion that the jury fixated on this one phrase that Defendant complains about is farfetched. And on the off chance that the jury caught this statement at all, the government clarified in rebuttal that the jury should not consider it. See id. 923 ("Earlier today, my colleague talked about why you should hold the defendant accountable. But let me be clear. The only reason he needs to be held accountable is because he has violated the law, the law Judge Donnelly will give you and the law that you have sworn to follow.").

Viewed against the broader record, this remark did not rise to the requisite level of "flagrant abuse," Elias, 285 F.3d at 190, or "egregious misconduct," United States v. Rodriguez, 587 F.3d 573, 583 (2d Cir. 2009). And any potential prejudice was fully mitigated by both the Court and the prosecutors' repeated reminders that the government's arguments were not evidence. See Trial Tr. 802 (Court informing jury "What any lawyer says during the course of a summation

73

is not evidence. . . . [I]t's going to be your recollection of the evidence that controls"); 805 (explaining in summation "what I say is not evidence"); id. 896 (reiterating in rebuttal that "arguments are not evidence; not mine, not defense counsel's either"); United States v. Rosa, 17 F.3d 1531, 1549 (2d Cir. 1994) ("[T]hough the trial court did not give a curative instruction directed precisely at this overstatement, it did instruct the jury that the statements of the attorneys did not constitute evidence."). Ultimately, Defendant falls far short of his "heavy burden" to show that "the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial." United States v. Farhane, 634 F.3d 127, 167 (2d Cir. 2011).

CONCLUSION

For the foregoing reasons, the defendant's post-trial motions should be denied.

Dated:        Brooklyn, New York
              June 3, 2026

                                    JOSEPH NOCELLA, JR.
                                    United States Attorney
                                    Eastern District of New York

                            By:      /s/
                                    Arun Bodapati
                                    Trial Attorney
                                    Samuel Rackear
                                    Special Assistant U.S. Attorney
                                    (718) 254-7000

74